# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ENVIRONMENTAL INTEGRITY PROJECT**<br>1000 Vermont Avenue NW, Suite 1100<br>Washington, DC 20005, | )<br>)<br>)<br>)<br>) |
| | ) |
| **FOOD & WATER WATCH**<br>1616 P Street NW<br>Washington, DC 20003, | ) Civil Action No. 1:20-cv-1734<br>)<br>)<br>) |
| | ) |
| **GUNPOWDER RIVERKEEPER**<br>P.O. Box 156<br>Monkton, MD 21111 | ) **COMPLAINT FOR**<br>) **DECLARATORY AND**<br>) **INJUNCTIVE RELIEF**<br>) |
| | ) |
| **LOWER SUSQUEHANNA RIVERKEEPER**<br>2098 Long Level Road<br>Wrightsville, PA 17368 | )<br>)<br>)<br>) |
| | ) |
| and | ) |
| | ) |
| **PATUXENT RIVERKEEPER**<br>17412 Nottingham Road<br>Upper Marlboro, MD 20772 | )<br>)<br>) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| v. | ) |
| | ) |
| **ANDREW WHEELER**, in his official capacity as Administrator of the United States Environmental Protection Agency<br>1200 Pennsylvania Ave., NW<br>Washington, DC 20460 | )<br>)<br>)<br>)<br>)<br>) |
| | ) |
| **UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**<br>1200 Pennsylvania Ave., NW<br>Washington, DC 20460 | )<br>)<br>)<br>)<br>)<br>) |
| | ) |
| **RICKEY DALE "R.D." JAMES**, in his official capacity as Assistant Secretary of the | )<br>) |

| | |
|---|---|
| United States Army Corps of Engineers (Civil Works)<br>441 G Street NW<br>Washington, DC 20314<br><br>and<br><br>**UNITED STATES ARMY CORPS OF ENGINEERS**<br>441 G Street NW<br>Washington, DC 20314<br><br>*Defendants.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## INTRODUCTION

1.      Plaintiffs Environmental Integrity Project, Food & Water Watch, Gunpowder Riverkeeper, Lower Susquehanna Riverkeeper, and Patuxent Riverkeeper (collectively, "Plaintiffs"), bring this action for declaratory and injunctive relief against the United States Environmental Protection Agency ("EPA"); Andrew R. Wheeler, in his capacity as Administrator of EPA; the United States Army Corps of Engineers ("Army Corps" or "the Corps"); and Ricky Dale James, in his capacity as Assistant Secretary of the Corps (collectively, the "Agencies").

2.      Plaintiffs seek judicial review under the Administrative Procedure Act, 5 U.S.C. § 551 *et seq*. ("APA") of the Agencies' recently promulgated final rule entitled "The Navigable Waters Protection Rule: Definition of 'Waters of the United States,'" 85 Fed. Reg. 22,250 (Apr. 21, 2020) ("2020 Final Rule").

3.      In the 2020 Final Rule, the Agencies seek to substantially revise the interpretation of the term "waters of the United States," which establishes the waters subject to jurisdiction under the Clean Water Act, 33 U.S.C. § 1251 *et seq*. ("CWA" or "Act").

1

4.      Because the term "waters of the United States" defines the scope of which waters are subject to the Act's substantive requirements—including the Act's permitting requirements—the scope of its definition is of fundamental importance to the faithful execution of and attainment with the Act's overarching objective: "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

5.      The 2020 Final Rule is the final step in the Agencies' efforts to repeal and replace their 2015 rule defining the "waters of the United States," which sought to implement the "significant nexus" standard articulated by Justice Anthony Kennedy's concurrence in *Rapanos v. United States*, 547 U.S. 715 (2006), and was based upon the Agencies' considerable expertise, extensive scientific analyses, and factual findings about the chemical, physical, and biological connectivity of waterbodies. *See* 80 Fed. Reg. 37,054 (June 29, 2015) ("2015 Clean Water Rule"). In promulgating the 2015 Clean Water Rule, the Agencies compiled and relied upon a substantial record that demonstrated the waterbodies regulated by the rule had significant and cumulative effects on the water quality and integrity of downstream jurisdictional waters.

6.      On February 28, 2017, President Donald Trump issued Executive Order 13778, which ordered the Agencies to "publish for notice and comment a proposed rule rescinding or revising" the 2015 Clean Water Rule and to propose a new definition of "waters of the United States" consistent with the President's stated policy objectives of "promoting economic growth, minimizing regulatory uncertainty, and showing due regard for the roles of the Congress and the States under the Constitution."

7.      Executive Order 13778 further ordered that for purposes of this proposed rule, the Agencies "shall consider interpreting the term 'navigable waters…' in a manner consistent with the opinion of Justice Antonin Scalia in *Rapanos*."

8.      Shortly after the issuance of Executive Order 13778, the Agencies initiated a two-step process, consisting of two parallel rulemakings, intended to first repeal the 2015 Clean Water Rule and then replace it with a revised definition of "waters of the United States."

9.      In "step one" of the process, the Agencies issued a proposed rule seeking to repeal the 2015 Clean Water Rule and re-codify the definition of "waters of the United States" that had previously been established by the Agencies in 1986. *See generally* 82 Fed. Reg. 34,899 (July 27, 2017). In 2019, the Agencies promulgated their final rule repealing the 2015 Clean Water Rule and re-codifying the 1986 definitions. *See generally* 84 Fed. Reg. 56,626 (Oct. 22, 2019).

10.     As "step two" of the process, the Agencies issued a proposed rule "intended to review and revise the definition of 'waters of the United States' consistent with" Executive Order 13778. *See* Revised Definition of "Waters of the United States," 84 Fed. Reg. 4154, 4154 (February 14, 2019) (the "2019 Proposed Rule"). The Agencies concluded their process with the promulgation of the 2020 Final Rule, which replaced the 1986 definition of "waters of the United States" with an even narrower definition categorically excluding many waters over which the Agencies have asserted CWA jurisdiction since the CWA's enactment.

11.     The Agencies adopted the 2020 Final Rule over the sustained objections of the Agencies' own experts and EPA's Science Advisory Board, whose comments on the 2019 Proposed Rule stated that the Agencies' proposed bright-line definitions—in particular the categorical exclusion of any waters connected to jurisdictional waters by subsurface hydrological connections—contradicted all established science, failed to provide long-term regulatory clarity, would likely result in unjustified new risks to human and environmental health, and were inconsistent with the plain text and objectives of the Act and the Agencies' interpretation of the Act since its enactment. *See, e.g.*, 2020 Final Rule at 22,261.

3

12.     As instructed by Executive Order 13778, the 2020 Final Rule discarded the "significant nexus" standard established by *Rapanos*—which had been endorsed by a majority of Justices on the Court—and instead crafted a new standard consistent with Justice Scalia's interpretation—which had been rejected by a majority of Justices.

13.     The Agencies justified this profound and abrupt departure from their own long-standing policies and the overwhelmingly contrary weight of scientific evidence by asserting that an agency is free to change its policies so long as it provides "a reasoned explanation for the actions it takes," and that "[a] change in administration… is a perfectly reasonable basis" for an agency to revise its policies. 2019 Proposed Rule at 4,169.

14.     The 2020 Final Rule states that "as directed by Executive Order 13778… the agencies are establishing this line-drawing based primarily on their interpretation of their authority under the Constitution and the language, structure, and legislative history of the CWA, as articulated in decisions by the Supreme Court." 2020 Final Rule at 22,270.

15.     The 2020 Final Rule also states that the Agencies based the rule on their "unifying legal theory for federal jurisdiction over those waters and wetlands that maintain a sufficient surface water connection to traditional navigable waters… that preserves the traditional sovereignty of States over their own land and water resources" and "is intended to ensure that the agencies operate within the scope of the Federal government's authority over navigable waters under the CWA and the Commerce Clause of the U.S. Constitution." *Id.* at 22,252.

16.     On April 23, 2020, a six-Justice majority of the Supreme Court rejected the Agencies' revised interpretation of the CWA as expressed by the Solicitor General, who at the time argued consistent with the position that would be taken in the 2020 Final Rule that "all releases of pollutants to groundwater are excluded from the scope of the permitting program,

4

even where pollutants are conveyed to jurisdictional surface waters via groundwater." *Cty. of Maui, Hawaii v. Hawaii Wildlife Fund*, 140 S. Ct. 1462, 1474 (2020) (internal quotations omitted). In rejecting this interpretation, the Court held that "EPA's reading would open a loophole allowing easy evasion of the statutory provision's basic purposes. Such an interpretation is neither persuasive nor reasonable." *Id.*

17.     Thus, the 2020 Final Rule's definition not only conflicts with the plain text and purpose of the CWA, defeats a central purpose of the CWA, and disregards judicial precedent, established science, and the Agencies' prior factual findings and longstanding policies and practices, but does so without any rational, let alone "reasonable," explanation.

18.     Accordingly, Plaintiffs respectfully request that this Court declare that the 2020 Final Rule is arbitrary and capricious, not otherwise in accordance with law, and in excess of the Agencies' statutory jurisdiction, in violation of the APA, 5 U.S.C. § 551 *et seq.*, and set aside and vacate the rule.

## JURISDICTION AND VENUE

19.     This action is brought pursuant to the judicial review provisions of the APA, 5 U.S.C. §§ 701-06, which waive the defendant Agencies' sovereign immunity. *See* 5 U.S.C. § 702 ("The United States may be named as a defendant in any such action [seeking relief other than money damages], and a judgment or decree may be entered against the United States[.]"); *see also Cohen v. United States*, 650 F.3d 717, 723 (D.C. Cir. 2011) ("there is no doubt Congress lifted the bar of sovereign immunity in actions not seeking money damages" under the APA).

20.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 (federal questions provision). *See also Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S.

Ct. 617, 623 (2018) (holding any challenges to the Agencies' "waters of the United States"

rulemakings under the APA "must be filed in federal district courts.").

21.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1) because

defendants are federal agencies and officers or employees of the United States acting in their

official capacities who officially reside within this District, a substantial part of the events giving

rise to the claim occurred in this District, and at least one plaintiff physically resides in this

District.

## PLAINTIFFS

22.     Plaintiff organizations are local or national 501(c)(3) non-profit environmental

organizations whose organizational purposes encompass "restor[ing] and maintain[ing] the

chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

23.     Plaintiffs qualify as "persons" within the meaning of 5 U.S.C. § 701(b)(2) and 5

U.S.C. § 551(2).

24.     Plaintiff Environmental Integrity Project ("EIP") is a nonpartisan, nonprofit

organization headquartered in Washington, D.C. and founded in 2002 by former EPA

enforcement attorneys for the purpose of advocating for more effective enforcement of

environmental laws. EIP's three main organizational objectives are: (1) to illustrate through

objective facts and data how the failure to enforce or implement environmental laws increases

pollution and affects the public's health; (2) to hold federal and state agencies, as well as private

entities, accountable for failing to enforce or comply with environmental laws; and (3) to help

local communities and underrepresented populations in key states obtain the protection of

environmental laws.

25.     Since its founding, one of EIP's core missions has been advocating for stronger

water protections and enforcing existing water protections for the nation's waterbodies,

6

particularly in the Chesapeake Bay watershed region. A central part of this mission includes monitoring and assuring compliance with the Chesapeake Bay Total Maximum Daily Load ("Bay TMDL"), which establishes limits on the amount of pollutants entering the Bay and its tributaries from the states of Maryland, Virginia, West Virginia, Pennsylvania, Delaware, New York, and the District of Columbia, and was implemented by EPA and the states under the CWA for the purpose of restoring and protecting the waters of the Bay region. *See generally* 76 Fed. Reg. 549 (Jan. 5, 2011) (establishing the Bay TMDL). To ensure compliance with the Bay TMDL and the CWA, EIP routinely reviews and comments on proposed CWA permits and federal and state water regulations, actively reviews data generated by sources of water pollutants to ensure compliance with existing permit requirements, and files citizen suits where necessary to enforce compliance. EIP's research analysts also review, compile, and analyze data on pollutant discharges obtained through disclosures required by the CWA and independent monitoring for the purpose of publicly disseminating said data to inform citizens and legislators of issues critical to water protection in the region. Recent EIP reports have included assessments of state progress towards achieving the Bay TMDL's cleanup targets,[1] the impact of agricultural sources of pollution on achievement of the Bay TMDL's goals,[2] and the potential regulatory

---

[1] *See generally* EIP Report, "The State of Chesapeake Bay Watershed Modeling: Comparing the Updated Phase 6 'Total Maximum Daily Load' Watershed Model to the Former Phase 5.3.2 Model." (July 25, 2019). Accessible at:
https://environmentalintegrity.org/wp-content/uploads/2019/08/Chesapeake-Bay-Watershed-Modeling.pdf
[2] *See generally* EIP Report, "Poultry and Manure Production on Virginia's Eastern Shore: Rapid Growth and Poor Environmental Compliance Threaten Waterways in Accomack County." (April 22, 2020). Accessible at: https://environmentalintegrity.org/wp-content/uploads/2020/04/VA-Eastern-Shore-Poultry-Report-4.22.20.pdf

consequences of the Agencies' (at the time proposed) efforts to repeal and replace the 2015 Clean Water Rule on the Chesapeake Bay watershed.[3]

26.      EIP as an organization will be harmed by the 2020 Final Rule's removal of CWA protection from vast numbers of waterbodies in the Chesapeake Bay watershed region that had previously subject to CWA protection under the 2015 Clean Water Rule. These waters include, for example, potentially 37,809 miles of headwater and ephemeral streams, as well as "Delmarva bays" or "potholes"—non-tidal wetlands in low-lying areas covering roughly 34,560 acres of the Eastern Shore of Maryland and Delaware—which the 2015 Clean Water Rule concluded served a myriad of critical chemical and biological functions for downstream traditional navigable waters despite the fact that many are connected to such waters only through subsurface hydrological connections. *See* 2015 Clean Water Rule at 37,071-3.

27.      The 2020 Final Rule's categorical exclusion of these waters from CWA protection—in spite of the Agencies' prior findings that such waters will inevitably impact the integrity of downstream waters and thus the Bay TMDL—will frustrate and perceptibly impair EIP's mission by making it more difficult for EIP to protect the waters of the Bay region and ensure the attainment of the Bay TMDL. As discharges into excluded waters will no longer be subject to a permit requirement—or the requirements to disclose and self-report information regarding discharges typically required by such permits—the 2020 Final Rule will deprive EIP of the crucial information it relies upon to analyze and assess the integrity of local waters, identify and educate the public and legislators on concerns to human and environmental health, and promote sound and effective policies addressing such concerns. The removal of jurisdiction

---

[3] *See generally* EIP Report, "Undermining Protection for Wetlands and Streams: What Proposed Federal Rollbacks Mean for the Chesapeake Region." (Dec. 12, 2018). Accessible at: https://environmentalintegrity.org/wp-content/uploads/2018/12/Chesapeake-Wetlands-report.pdf

from these waters will also preclude EIP from protecting downstream jurisdictional waters through its normal avenues, such as participating in CWA permitting processes and federal citizen suits to enforce compliance with federal and state requirements as authorized under the CWA.

28.     The 2020 Final Rule will also harm EIP by forcing it to increase the resources it must devote to its water protection programs merely to maintain the status quo. For example, because state water laws often contain statutory gaps—particularly with regards to wetlands protection—that were previously covered by federal protection under the CWA, the 2020 Final Rule's drastic reduction in the scope of waters protected under the Act will harm EIP by forcing it to divert resources to independently monitoring discharges and water quality to identify and counteract pollutant increases in each state likely to result from the Agencies' abdication of CWA authority. The 2020 Final Rule will also force EIP to divide its limited resources across a patchwork of inconsistent state regulatory regimes to ensure that regional water quality and progress towards the Bay TMDL does not deteriorate below standards previously established and enforceable under the CWA. For these reasons, EIP previously submitted comments opposing the Agencies' 2019 Proposed Rule[4] and brings this action against the 2020 Final Rule.

29.     Plaintiff Food & Water Watch ("FWW") is a national nonprofit organization that mobilizes regular people to build political power to move bold and uncompromised solutions to the most pressing food, water, and climate problems of our time. FWW has more than one million members and supporters nationwide, and is headquartered in Washington, D.C. but

---

[4] *See generally* Comments of the Environmental Integrity Project and Food & Water Watch on the Agencies' Proposed "Revised Definition of Waters of the United States." (Apr. 15, 2019). Docket No. EPA-HQ-OW-2018-0149-11440. Accessible at:
https://www.regulations.gov/contentStreamer?documentId=EPA-HQ-OW-2018-0149-11440&attachmentNumber=1&contentType=pdf

maintains offices across the country. FWW uses grassroots organizing, media outreach, public education, research, policy analysis, and litigation to protect people's health, communities, and democracy from the growing destructive power of the most powerful economic interests. Protecting waterways and combating the water pollution and other harms associated with concentrated animal feeding operations ("CAFOs"), fossil fuel infrastructure, and other industrial polluters are among FWW's priority issues.

30.     FWW has advocated for stronger clean water protections since its founding in 2005. FWW is engaged in several campaigns and litigation efforts to hold CAFOs accountable for their water pollution and other harms through stronger regulation and enforcement, increased transparency, and public education and engagement. FWW communicates extensively with its members, supporters, and the general public about threats to U.S. waterways by releasing reports and fact sheets, issuing press releases and statements, publishing online news pieces, and sending emails and action alerts. FWW also has more than a decade of experience advocating for stronger oversight of CAFO water pollution, including by petitioning EPA to strengthen its CAFO Clean Water Act regulations and challenging several state- and EPA-issued CAFO discharge permits for failing to meet federal and state water protection requirements. Ensuring that as many waterways as possible are protected under the CWA is central to this work, as many CAFOs discharge pollution into waterways not protected under the 2020 Final Rule but with a "significant nexus" to a traditionally navigable water and harm downstream water quality.

31.     FWW as an organization will be harmed by the 2020 Final Rule's removal of CWA protection from vast numbers of waterbodies. The 2020 Final Rule will frustrate and perceptibly impair FWW's mission by undermining CAFO permitting requirements and further threatening these waterways with unchecked pollution, forcing FWW to commit resources to

10

identify and counteract pollutant increases likely to result, depriving FWW of key information it relies upon to educate its members and the public, and precluding FWW from combating water pollution through its normal avenues such as participation in CAFO permitting and citizen suits under the CWA.

32.    The 2020 Final Rule will also injure the aesthetic, recreational, and financial interests of FWW's individual members who live and/or recreate in, on, or in close proximity to waterways affected by the rule, regularly visit and use such waterways for aesthetic and recreational purposes, are concerned that they will likely be exposed to and adversely affected by increases in pollutant discharges resulting from the 2020 Final Rule's removal of CWA protection from these waterways, and would ordinarily have standing to sue in their own right. For these reasons, FWW previously submitted comments opposing the 2019 Proposed Rule, *see supra* footnote 4, and joins this action against the 2020 Final Rule.

33.    Gunpowder Riverkeeper ("GRK") is a local nonprofit organization dedicated to the purpose of protecting, conserving, and restoring the Gunpowder River—a 6.8-mile long tidal inlet located in Maryland—and its watershed. GRK and its approximately 175 members are committed to ensuring that the important aesthetic, recreational, and economic values served by the Gunpowder River watershed are preserved for all users and members of the public. These commitments are central to its mission. The chemical and biological integrity of the Gunpowder River is especially vital to preserving populations of local wildlife essential to the fishing, aquaculture, and recreational activities which comprise a substantial portion of the economic activities in the Bay region and sustain the livelihoods of many of GRK's individual members.

34.    As a part of its mission, GRK conducts independent water quality tests for bacteria and other harmful pollutants in the watershed, uses geographic information system

mapping to visually report the results of these water quality tests, and shares this data with regulatory agencies and the public (through its website) for the purpose of raising public awareness of water quality issues and informing the public as to how choices residents make can impact local rivers and streams. GRK also monitors discharges from nearby industrial activities as well as agricultural, commercial, and residential compliance with stormwater runoff requirements, and advocates for best management practices for such discharges.

35.     GRK as an organization will be harmed by the 2020 Final Rule. The 2020 Final Rule's categorical exclusion from CWA protection of upstream waters which inevitably impact the Gunpowder River will frustrate and perceptibly impair GRK's mission by making it more difficult for GRK to restore and protect the waters of the Gunpowder River watershed, undermining GRK's efforts to reduce runoff and discharges into the Gunpowder River and its watershed, and precluding GRK from combating water pollution through its normal avenues such as participation in CWA permitting processes and litigation under the CWA's citizen suit provision. The 2020 Final Rule will also harm GRK by forcing it to devote resources to identify and counteract pollutant increases likely to result from the removal of CWA protection from upstream waters.

36.     The 2020 Final Rule will also injure the aesthetic, recreational, and economic interests of GRK's individual members who live near the Gunpowder River and its tributaries and regularly use such waterways for aesthetic, recreational, and economic purposes, are concerned that they will likely be exposed to and adversely affected by increases in pollutant discharges resulting from the 2020 Final Rule's removal of CWA protection from these waterways, and would ordinarily have standing to sue in their own right. In particular, numerous members of GRK rely upon business from fly-fishing and tourism encouraged by the cold-water

12

fishery resources and scenic natural beauty of the Gunpowder River and its tributaries for their economic livelihoods, and would be economically harmed by any degradation of local water quality or wildlife populations.

37.     Plaintiff Lower Susquehanna Riverkeeper ("LSRA") is a grassroots nonprofit membership organization that is dedicated to improving and protecting the ecological and biological integrity of the Susquehanna River in both Pennsylvania and Maryland. The Susquehanna River is the longest river on the East Coast of the United States and a very important tributary of the Chesapeake Bay. LSRA and its members, who include local residents, outdoorsmen, recreationalists, and families, are dedicated to preserving safe drinking water, the sustainable use of natural resources, and the ability to fish, swim, and recreate safely in the Susquehanna River and her tributaries. LSRA works with local decision-makers and conservation districts to emphasize the economic and social benefits of conservation and addresses violations at construction, industrial, and agricultural sites, coordinates cleanups and watershed improvement projects, and takes legal action when necessary to enforce existing laws.

38.     LSRA as an organization will be harmed by the 2020 Final Rule. The 2020 Final Rule's categorical exclusion from CWA protection of upstream waters, including ephemeral streams, which inevitably impact the Susquehanna River will frustrate and perceptibly impair LSRA's mission by making it more difficult for LSRA to restore the waters of the Susquehanna River watershed, undermining LSRA's efforts to reduce agricultural encroachment upon nearby wetlands, and precluding LSRA from combating water pollution through its normal avenues such as participation in CWA permitting processes and litigation under the CWA's citizen suit provision. The 2020 Final Rule will also harm LSRA by forcing it to devote resources to identify

and counteract pollutant increases likely to result from the removal of CWA protection from upstream waters—particularly nearby wetlands.

39.     The 2020 Final Rule will also injure the aesthetic, recreational, and financial interests of LSRA's individual members who live and/or recreate in, on, or in close proximity to waterways affected by the rule, regularly visit and use such waterways for aesthetic and recreational purposes, are concerned that they will likely be exposed to and adversely affected by increases in pollutant discharges resulting from the 2020 Final Rule's removal of CWA protection from these waterways, and would ordinarily have standing to sue in their own right.

40.     Plaintiff Patuxent Riverkeeper ("PRK") is a Maryland-based grassroots membership organization formed in 2005 and dedicated to the purpose of conserving, protecting, and replenishing the Patuxent River and its watershed. The Patuxent River is Maryland's longest and deepest intrastate waterway and a critical tributary of the Chesapeake Bay (ranking seventh highest amongst all tributaries in terms of fresh-water flow into the Bay) and provides extended habitat for a wide array of indigenous and migratory wildlife, including over 100 species of fish. A number of smaller tributaries that branch from the river as it flows southward through Maryland's western shore, as well as the river's tidal and estuarial zones in its southern reaches, help comprise the Patuxent watershed's total drainage into the Bay.

41.     PRK employs a combination of strategic advocacy, restoration activities, and public education to ensure the long-term sustainability of the ecosystem of the entire Patuxent River basin on behalf of all members of the public. PRK's activities include seeking more stringent enforcement of stormwater runoff regulations, monitoring upgrades and compliance for both major and minor wastewater sewage sources, conducting independent monitoring and bringing litigation where necessary, advocating for the preservation of open spaces, wetlands,

14

and other stream buffers against agricultural encroachment, and promoting comprehensive plans to clean up the river and encourage practices that prevent further degradation. PRK also organizes efforts to clean up and restore the river, maintains a group of volunteers dedicated to preserving river flow and fish passages, works to improve public access for paddling and similar low-impact recreational activities, and raises public awareness of issues affecting the Patuxent River basin's waters through speaking events and guided river tours at PRK's visitor center.

42.     PRK as an organization will be harmed by the 2020 Final Rule. The 2020 Final Rule's categorical exclusion from CWA protection of upstream waters which inevitably impact the Patuxent watershed will frustrate and perceptibly impair PRK's mission by making it harder to prevent further degradation, undermining their efforts to clean up and restore the river, forcing PRK to devote resources to identify and counteract pollutant increases likely to flow from upstream excluded waters, and by precluding PRK from combating water pollution through its normal avenues such as participation in permitting and citizen suits under the CWA. Degradation of the river's water quality will also harm PRK financially by potentially discouraging members of the public from signing up for PRK's guided paddling tours as a result of diminished aesthetic beauty and potential health concerns related to contact with polluted waters.

43.     The 2020 Final Rule will also injure the aesthetic, recreational, and financial interests of PRK's individual members who live and/or recreate in, on, or in close proximity to waterways affected by the rule, regularly visit and use such waterways for aesthetic and recreational purposes, are concerned that they will likely be exposed to and adversely affected by increases in pollutant discharges resulting from the 2020 Final Rule's removal of CWA protection from these waterways, and would ordinarily have standing to sue in their own right.

44.     Both the injuries to Plaintiffs' organizations and their individual members alleged above will be redressed by an order vacating the 2020 Final Rule.

## DEFENDANTS

45.     U.S. EPA and the Army Corps are "agencies" within the meaning of 5 U.S.C. § 701(b)(1).

46.     Defendant EPA is the federal agency charged with primary regulatory authority to administer the majority of the CWA. *See* 33 U.S.C. § 1251(d).

47.     Defendant Andrew R. Wheeler is sued in his official capacity as Administrator of EPA.

48.     Defendant Army Corps shares regulatory authority with EPA over the Act's Section 404 permit program for dredge and fill permits. *See* 33 U.S.C. § 1344.

49.     Defendant Rickey D. James is sued in his official capacity as Assistant Secretary of the Army for Civil Works within the Army Corps.

## STATUTORY BACKGROUND

### The Administrative Procedure Act

50.     Federal agencies may issue, amend, or repeal a rule only in accordance with the procedures prescribed by the APA. *See generally* 5 U.S.C. §§ 551-555.

51.     The APA mandates that each agency "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

52.     Agencies are also required to consider all important aspects of the problem that is the subject of rulemaking, and evidence that an agency has "artificial[ly] narrow[ed] the scope of

16

the regulatory problem is itself arbitrary and capricious and is ground for reversal." *Home Box Office, Inc. v. F.C.C.*, 567 F.2d 9, 36 (D.C. Cir. 1977).

53.     When an agency promulgates a rule, the agency may not ignore or countermand its earlier factual findings relating to the matter without articulating a reasoned explanation and rational basis for the modification, and evaluating any reliance interests that may have been engendered by the agency's prior position. "An '[u]nexplained inconsistency' in agency policy is 'a reason for holding an interpretation to be an arbitrary and capricious change from agency practice.'" *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (quoting *National Cable & Telecommunications Assn. v. Brand X Internet Services,* 545 U.S. 967, 981 (2005)).

54.     An agency rule must also comply with and implement statutory law and binding legal precedent. If a court "ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *United States v. Home Concrete & Supply, LLC*, 566 U.S. 478, 488 (2012) (quoting *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,* 467 U.S. 837, 843 n. 9 (1984) ("The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent.").

55.     An agency's authority is necessarily constrained by the statute it is empowered to implement, and an agency cannot act beyond the scope of the authority delegated to it by Congress. *See Louisiana Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 357 (1986) ("an agency literally has no power to act… unless and until Congress confers power upon it."). Thus, only "agency determinations within the scope of delegated authority are entitled to deference," and "it is fundamental 'that an agency may not bootstrap itself into an area in which it has no

jurisdiction.'" *Adams Fruit Co. v. Barrett*, 494 U.S. 638, 650 (1990) (quoting *Federal Maritime Comm'n v. Seatrain Lines, Inc.,* 411 U.S. 726, 745 (1973)).

56.     The APA also mandates that agencies engaging in rulemaking "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(c).

57.     The "opportunity for comment must be a meaningful opportunity," *Nat'l Tour Brokers Ass'n v. United States*, 591 F.2d 896, 902 (D.C. Cir. 1978), and an agency's "refusal to consider evidence bearing on the issue before it"—including matters presented by the public in comments—"constitutes arbitrary agency action within the meaning of § 706[.]" *Butte Cty., Cal. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010).

58.     Accordingly, the APA authorizes this Court to "hold unlawful and set aside agency actions, findings and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C).

59.     The APA makes clear that "to the extent necessary to decision… the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706.

60.     The APA grants the district courts wide latitude over remedy, including the authority to grant both declaratory judgment and injunctive relief, and this Circuit's precedent has "made clear that '[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated[.]'" *Nat'l Min. Ass'n v. U.S. Army Corps of Engineers*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (quoting *Harmon v. Thornburgh,* 878 F.2d 484, 495 n. 21 (D.C. Cir.1989)); *see also* 5 U.S.C. § 702.

61.     This Court also is authorized to award reasonable fees and expenses of attorneys to a prevailing party in such an action by the Equal Access to Justice Act, 28 U.S.C.A. § 2412.

**The Clean Water Act**

62.     The CWA was enacted by Congress in 1972, "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

63.     To effectuate this goal, the Act makes clear that "[e]xcept as in compliance" with the CWA, "the discharge of any pollutant by any person shall be unlawful." 33 U.S.C. § 1311(a).

64.     Congress enacted the CWA expressly because it found that the prior federal water pollution control program, under which "States were to decide the uses of water to be protected, the kinds and amounts of pollutants to be permitted, the degree of pollution abatement to be required [and] the time to be allowed a polluter for abatement," had "been inadequate in every vital aspect[.]" S. Rep. No. 92-414 (1971), *reprinted in* 1972 U.S.C.C.A.N. 3668, 3674-5.

65.     Consequently, "Congress chose to define the waters covered by the Act broadly… to repudiate limits that had been placed on federal regulation by earlier water pollution control statutes" and in recognition of the reality that "[p]rotection of aquatic ecosystems… demanded broad federal authority to control pollution." *United States v. Riverside Bayview Homes, Inc*., 474 U.S. 121, 132-33 (1985).

66.     The Act directs the EPA Administrator to "prepare or develop comprehensive programs for preventing, reducing, or eliminating the pollution of the navigable waters and ground waters," 33 U.S.C. § 1252(a), and defines the term "pollution" broadly to include any "man-made or man-induced alteration of the chemical, physical, biological, and radiological integrity of water." 33 U.S.C. § 1362(19).

67.    The Act's central means of controlling pollution from point sources is through forbidding the discharge of any pollutants, including dredged and fill materials, into "navigable waters" without a permit. 33 U.S.C. §§ 1311(a), 1342, 1344, 1362(6), (12).

68.    The term "navigable waters" governs the scope and jurisdiction of all of the CWA's substantive regulatory provisions—including the scope of the permit program for discharges of dredged and fill materials under Section 404, the National Pollutant Discharge Elimination System ("NPDES") permit program under Section 402, and the applicability of additional measures that may be necessary to meet state-determined water quality standards. *See* 33 U.S.C. §§ 1313, 1342, 1344.

69.    Though the Act defines "navigable waters" as "the waters of the United States, including the territorial seas," *id.* at §1362(7), the Supreme Court has long recognized that "the term 'navigable' is of 'limited import'" and that Congress clearly intended to "regulate at least some waters that would not be deemed 'navigable' under the classical understanding of that term"—including waterbodies with a "significant nexus" to navigable waters, *Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Engineers*, 531 U.S. 159, 167 (2001) ("*SWANCC*") (quoting *Riverside Bayview*, 474 U.S. at 133).

70.    Under the CWA's scheme of cooperative federalism, each State retains primary responsibility for assuring water quality within the State. *See* 33 U.S.C. § 1313. However, "Congress' intent in enacting the [CWA] was clearly to establish an all-encompassing program of water pollution regulation," through ensuring "[e]very point source discharge is prohibited unless covered by a permit, which directly subjects the discharger to the administrative apparatus established by Congress to achieve its goals." *City of Milwaukee v. Illinois & Michigan*, 451 U.S. 304, 317–18 (1981); *see also* 1972 U.S.C.C.A.N. 3668, 3674-5 (stating that the CWA's permit

system is intended to "establish[] a direct link between the Federal government and each industrial source of discharge into the navigable waters.").

71.     Accordingly, the CWA expressly requires that any NPDES permit issued by EPA comply with "all applicable requirements" of the Act or any "such conditions as the Administrator determines are necessary to carry out the provisions of this chapter," 33 U.S.C. § 1342(a)(1), and "allow[s] EPA to delegate its [NPDES] permitting authority to a State *only if* the State (among other things) provides 'adequate authority'" to ensure compliance with the requirements of the Act. *Cty. of Maui*, 140 S. Ct. at 1474-5 (quoting 33 U.S.C. § 1342(b)).

72.     Though States may adopt requirements more stringent than the national standards established by EPA pursuant to its authority under the CWA, they may not adopt or enforce any standards, limitations, or measures less stringent than those national standards. 33 U.S.C. § 1370.

73.     The Act establishes these nationwide minimum pollution controls applicable to the "waters of the United States" in order to create a uniform national floor of protective measures—which had been crucially absent in prior federal pollution control efforts. *Id.*; *see also* 1972 U.S.C.C.A.N. 3668, 3675. ("States whose own programs are superior are to be called upon to administer the permit system within their boundaries.") (emphasis added).

## REGULATORY AND FACTUAL BACKGROUND

### *Rapanos* **and the 2015 Clean Water Rule**

74.     The Agencies have previously sought to define the scope of "waters of the United States" in regulations issued in 1977, 1980, 1982, 1986, and 1988. *See generally* 42 Fed. Reg. 37, 144 (July 19, 1977); 45 Fed. Reg. 85,336 (Dec. 24, 1980); 47 Fed. Reg. 31,794 (July 22, 1982); 51 Fed. Reg. 41,206 (Nov. 13, 1986); 53 Fed. Reg. 20,764 (June 6, 1988).

21

75.    In these regulations, the Agencies defined the "waters of the United States" to cover: (1) waters used or susceptible to use in interstate and foreign commerce, commonly referred to as navigable-in-fact or "traditionally navigable" waters; (2) interstate waters; (3) the territorial seas; and (4) other waters having a nexus with interstate commerce.

76.    The Supreme Court most recently considered the definition of the term "waters of the United States" in *Rapanos v. United States*, 547 U.S. 715 (2006).

77.    The *Rapanos* Justices failed to come to an agreement, which resulted in the Court issuing a plurality opinion authored by Justice Scalia.

78.    Justice Scalia's plurality opinion offered a narrow interpretation of the Act's jurisdiction as encompassing only "relatively permanent, standing or continuously flowing bodies of water 'forming geographic features' that are described in ordinary parlance as streams, oceans, rivers, and lakes." *Id.* at 739 (internal quotations omitted). Justice Scalia's definition also excluded "channels through which waters flow intermittently or ephemerally, or channels that periodically provide drainage for rainfall," *id.*, and included only "wetlands with a continuous surface connection to bodies that are 'waters of the United States' in their own right." *Id.* at 742.

79.    Five Justices rejected Justice Scalia's definition as too narrow and "inconsistent with the Act's text, structure, and purpose." *Id.* at 776 (Justice Kennedy concurring in judgment); *id.* at 800 (Justices Stevens, Souter, Ginsburg, and Breyer dissenting) ("As Justice KENNEDY observes, 'these limitations... are without support in the language and purposes of the Act or in our cases interpreting it.' *Ante,* at 2242.").

80.    In his concurrence, Justice Kennedy noted that neither the Act nor the Court's precedent supported a surface water connection requirement, *id*. at 774, and stated that wetlands are "waters of the United States" subject to CWA jurisdiction if they, "either alone or in

22

combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity" of jurisdictional waters. *Id.* at 780.

81.     Justice Kennedy agreed with the four dissenting Justices that Congress intended the CWA to regulate non-navigable waterbodies with a "significant nexus" to navigable waters, and that the required nexus "must be assessed in terms of the statute's goals and purposes… to 'restore and maintain the chemical, physical, and biological integrity of the Nation's waters." *Id.* at 779.

82.     Following *Rapanos*, the Agencies issued a guidance memorandum for the purpose of instructing their regional offices on how to implement Justice Kennedy's "significant nexus" test when asserting jurisdiction over "waters of the United States." *See* EPA and Corps, "Clean Water Act Jurisdiction Following… *Rapanos*," (Dec. 2, 2008).[5] ("2008 *Rapanos* Guidance").

83.     The 2008 *Rapanos* Guidance attempted to establish a rubric for jurisdiction implementing the significant nexus standard. Under this rubric, the Agencies established three types of categorically jurisdictional waters: (1) navigable waters and their adjacent wetlands; (2) non-navigable tributaries of navigable waters that are relatively permanent; and (3) wetlands that directly abut those non-navigable tributaries. *Id.* at 3.

84.     Adjacent wetlands were defined to include those with either a continuous surface or shallow sub-surface connection to jurisdictional waters, wetlands separated from jurisdictional waters by barriers, and wetlands reasonably close in proximity to jurisdictional waters. *Id.* at 5.

85.     In accordance with *Rapanos*, the 2008 *Rapanos* Guidance further provided that the Agencies would assess the jurisdiction of certain waters—including non-navigable and not

---

[5] Accessible at:
https://www.epa.gov/sites/production/files/2016-02/documents/cwa_jurisdiction_following_rapanos120208.pdf

relatively permanent tributaries and their adjacent wetlands—on a fact-specific, case-by-case basis according to a significant nexus analysis requiring the consideration of numerous relevant chemical, physical, and biological factors, such as flow characteristics and various ecological functions of those waters, "to determine if they significantly affect the chemical, physical and biological integrity of downstream traditional navigable waters." *Id.* at 1, 8-11.

86.    As the Agencies have recently acknowledged, the vast majority of federal courts "agreed with this position" and relied either "exclusively on Justice Kennedy's significant nexus test" as the standard for jurisdiction under the Act or held "that jurisdiction can be established under either the plurality or concurring opinions." 2019 Proposed Rule at 4167 (emphasis added).

87.    Subsequent to *Rapanos*, the Agencies developed and promulgated the 2015 Clean Water Rule, 80 Fed. Reg. at 37,054 (June 29, 2015), which was intended to more clearly establish standardized procedures by which the Agencies would implement the significant nexus standard using "the text of the statute, Supreme Court decisions, the best available peer-reviewed science, public input, and the Agencies' technical expertise and experience." *Id.* at 37,055.

88.    In accordance with the standard endorsed by a majority of the Justices in *Rapanos*, the 2015 Clean Water Rule interpreted the Act to "cover those waters that require protection in order to maintain the chemical, physical, or biological integrity of traditional navigable waters, interstate waters, and the territorial seas," *id.*, including waters determined on a fact-specific, case-by-case basis to have a "significant nexus" with downstream navigable-in-fact waters. *Id.* at 37,057.

89.    In developing the 2015 Clean Water Rule, the Agencies performed rigorous scientific review and made extensive factual findings about types of waters significantly

affecting the integrity of downstream navigable waters. For example, the Agencies relied on a comprehensive report prepared by EPA's Office of Research and Development, entitled "Connectivity of Streams and Wetlands to Downstream Waters: A Review and Synthesis of the Scientific Evidence," (Jan. 2015) ("2015 Connectivity Report"),[6] which analyzed a vast body of scientific evidence—including over 1,200 peer-reviewed science publications—in order to inform EPA as to which waters may have a "significant nexus" with downstream jurisdictional waters. *Id.*

90.     In 2013, EPA released a draft of the 2015 Connectivity Report for public comment, as well as a comprehensive independent scientific and technical review by EPA's Science Advisory Board—at the time, an independent advisory board comprised of more than 50 members from a diverse variety of sectors such as academia, non-profits, state government, and industry representatives and consultants. *Id.* at 37,062.

91.     The EPA Science Advisory Board's review, which was conducted by a special panel of 27 experts in relevant fields who were nominated by the public, was highly supportive of the 2015 Connectivity Report's findings and provided additional recommendations on how the Agencies might incorporate the report's scientific findings to establish more definitive and fact-based principles regarding which waters shared a "significant nexus" with jurisdictional waters. *See* U.S. EPA, "SAB Review of the Draft EPA Report Connectivity of Streams and Wetlands to Downstream Waters: A Review and Synthesis of the Scientific Evidence," (Oct. 17, 2014) ("EPA Science Advisory Board Review").[7]

---

[6] Docket No. EPA-HQ-OW-2011-0880-20859. Accessible at: https://downloads.regulations.gov/EPA-HQ-OW-2011-0880-20859/content.pdf
[7] Docket No. EPA-HQ-OW-2011-0880-8046. Accessible at: https://downloads.regulations.gov/EPA-HQ-OW-2011-0880-8046/content.pdf

92.     Both the 2015 Connectivity Report and the EPA Science Advisory Board review overwhelmingly concluded that protection of certain categories of upstream non-navigable waters identified as jurisdictional in the 2015 Clean Water Rule—including non-navigable, relatively permanent tributaries and wetlands sharing a surface or shallow subsurface connection to jurisdictional waters—was "critical to maintaining the integrity of the downstream waters." 2015 Clean Water Rule at 37,056.

93.     While the EPA Science Advisory Board acknowledged that the report was "a science, not policy, document," it noted the report had been explicitly solicited "to inform the EPA's efforts to clarify the jurisdiction of the Clean Water Act" and prepared with that end in mind. EPA Science Advisory Board Review at 9. In particular, the EPA Science Advisory Board stressed that "[i]f the goal of defining and estimating connectivity is to protect downstream waters, the interpretation must move from a dichotomous, categorical distinction (connected vs. not connected) towards a gradient approach that recognizes variation in the frequency, duration, magnitude, predictability, and consequences of those connections." *Id.* at 58-59.

94.     The EPA Science Advisory Board's review provided reasoned explanations of the scientific evidence supporting the importance of each proposed gradient factor on downstream water quality, as well as how each of these factors might be best applied to the context of developing a workable rubric for evaluating a "significant nexus" to jurisdictional waters. *Id.*

**Executive Order 13778 and the 2019 Proposed Rule**

95.     On February 28, 2017, President Donald Trump issued Executive Order 13778, entitled "Restoring the Rule of Law, Federalism, and Economic Growth by Reviewing the 'Waters of the United States' Rule." ("EO 13778"), which "ordered" the Agencies to "review the [2015 Clean Water Rule] for consistency" with the President's stated policy objectives of

"promoting economic growth, minimizing regulatory uncertainty, and showing due regard for the roles of the Congress and the States under the Constitution."

96.     EO 13778 further ordered the Agencies "to publish for notice and comment a proposed rule rescinding or revising" the 2015 Clean Water Rule, and ordered that for purposes of such proposed rule, the Agencies "shall consider interpreting the term 'navigable waters…' in a manner consistent with the opinion of Justice Antonin Scalia in *Rapanos*." *Id.*

97.     Shortly after the issuance of Executive Order 13778, the Agencies initiated a two-step process—consisting of two parallel rulemakings—intended to first repeal the 2015 Clean Water Rule and re-codify the 1986 definition of waters of the United States, and then replace the 1986 definition with a new, revised definition of "waters of the United States."

98.     "Step one" of the process consisted of the Agencies' efforts to repeal the 2015 Clean Water Rule and re-codify the definition of "waters of the United States" previously established by the Agencies in 1986. *See generally* 82 Fed. Reg. 34,899 (July 27, 2017); 84 Fed. Reg. 56,626 (Oct. 22, 2019).[8]

99.     These repeal efforts ignored the substantial factual record developed to support the 2015 Clean Water Rule, and instead merely cited EO 13778 in asserting that repeal based on "a change in administration" was "perfectly reasonable" and "well within the scope of authority that Congress has delegated to the agencies under the CWA." 82 Fed. Reg. 34,899, 34,899.

100.    "Step two" of the process consisted of the Agencies' efforts to propose a new definition of "waters of the United States" consistent with EO 13778's directives of "promoting economic growth, minimizing regulatory uncertainty, and showing due regard for the roles of the

---

[8] The finalized version of this repeal is the subject of separate litigation but is not being challenged by Plaintiffs in this Complaint, as it has essentially been mooted by the promulgation of the 2020 Final Rule (which concluded the Agencies' two-step repeal and replace process).

Congress and the States under the Constitution" and interpreting "the term 'navigable waters…'
in a manner consistent with the opinion of Justice Antonin Scalia in *Rapanos*."

101.    As a part of these efforts, the Agencies promulgated the 2019 Proposed Rule,
which was "intended to review and revise the definition of 'waters of the United States'
consistent with the Executive Order signed on February 28, 2017[.]" *See* Revised Definition of
"Waters of the United States," 84 Fed. Reg. 4154, 4154 (February 14, 2019).

102.    The 2019 Proposed Rule did not incorporate any of the findings of the exhaustive
scientific or cost-benefit analyses previously conducted in support of the 2015 Clean Water Rule,
and ignored or contradicted nearly all of the findings and recommendations the Agencies
themselves had previously solicited from EPA's Office of Research and Development and EPA's
Science Advisory Board.

103.    The 2019 Proposed Rule recommended the adoption of a binary, categorical
approach to jurisdiction centering around physical abutment and surface-water connection
requirements that the Agencies' experts and the EPA Science Advisory Board had strenuously
recommended against as arbitrary and contrary to all science—and which the majority of Justices
in *Rapanos* had expressly rejected as "inconsistent with the Act's text, structure, and purpose."
*Rapanos*, 547 U.S. at 776.

104.    The Agencies' "reasoned explanation" for rejecting the overwhelming weight of
scientific evidence and their experts' recommendations was merely to state that jurisdiction "is a
legal distinction, not a scientific one" and that the change was justified by the "policy choices
and expertise of the executive branch agencies charged with administering the CWA." 2019
Proposed Rule at 4187.

28

105.    The 2019 Proposed Rule stated the Agencies would categorically exclude subsurface hydrological connections as a basis for jurisdiction, based on the Agencies' view that considering subsurface hydrology as a basis for jurisdiction would exceed "the limitations on federal authority embodied in section 101(b) of the Act," "encroach on State and tribal authority over land and water resources," and "could be confusing and difficult to implement." *Id.* at 4189.

106.    The Agencies also proposed to "eliminate the case-by-case application of Justice Kennedy's significant nexus test" in favor of "clear categories of jurisdictional waters" established based on "those policies that [the Agencies] deem most important in shaping the jurisdiction of the CWA," such as the "autonomy of the States" and "the right of the public to clear limits to agency authority." *Id.* at 4197.

107.    In its draft comments vehemently opposing the 2019 Proposed Rule, the EPA Science Advisory Board stated that the Agencies' proposed categorical definitions were "in conflict with established science, the existing WOTUS rule developed based on the established science, and the objectives of the Clean Water Act." EPA Science Advisory Board, "Commentary on the Proposed Rule Defining the Scope of Waters Federally Regulated Under the Clean Water Act," (Oct. 16, 2019) ("Draft Comments of the EPA Science Advisory Board") at 1.[9]

108.    The EPA Science Advisory Board further noted that unlike the 2015 Clean Water Rule, the 2019 Proposed Rule "offers no comparable body of peer reviewed evidence," "no scientific justification for abandoning the more expansive view of connectivity of waters accepted by current hydrological science," and "neglects established science pertaining

---

[9] Docket No. EPA-HQ-OW-2018-0149-11589, Attachment 1. Accessible at:
https://downloads.regulations.gov/EPA-HQ-OW-2018-0149-11589/attachment_1.pdf

specifically to the connectivity of ground water to wetlands and adjacent major bodies of water." *Id.* at 2.

109.    The EPA Science Advisory Board further stated that the 2019 Proposed Rule lacked a "coherent basis for drawing simple 'bright lines' to determine jurisdictional waters," and that "by abandoning a scientific basis to adopt a simplistic, if clear surface water-based definition, this approach neither rests upon science, nor provides long term clarity." *Id.* at 3.

110.    The EPA Science Advisory Board also stated that the 2019 Proposed Rule's lack of any coherent factual basis was especially problematic because the Agencies' jurisdictional "bright lines" were themselves vague, poorly defined, and inconsistent with each other and the Agencies' asserted legal rationales. *Id.* at 5 ("[T]here is no scientific justification for excluding ground water from WOTUS if spring-fed creeks are considered to be jurisdictional.").

111.    The EPA Science Advisory Board particularly opposed the Agencies' decision to categorically exclude wetlands sharing only subsurface connections to jurisdictional waters, noting that the EPA Science Advisory Board's review of the 2015 Clean Water Rule had "found a sound scientific basis for the inclusion of these wetlands… No body of peer reviewed evidence has been presented to support an alternative conclusion." *Id.* at 3.

112.    The EPA Science Advisory Board's draft comments concluded:

> In summary, the SAB is disappointed that the EPA and Department of the Army have decided that the CWA and subsequent case law precludes full incorporation of the scientific aspects of EPA's 2015 Connectivity Report into the proposed Rule. The proposed definition of WOTUS is not fully consistent with established EPA recognized science, may not fully meet the key objectives of the CWA – "to restore and maintain the chemical, physical and biological integrity of the Nation's waters," and is subject to a lack of clarity for implementation. The departure of the proposed Rule from EPA recognized science threatens to weaken protection of the nation's waters by disregarding the established connectivity of ground waters and by failing to protect ephemeral streams and wetlands which connect to navigable waters below the surface. These changes are proposed without a fully supportable

scientific basis, while potentially introducing substantial new risks to human and environmental health.

*Id.* at 6.

113.    The Agencies rejected the EPA Science Advisory Board's draft comments entirely and stated in response that the Science Advisory Board's concerns were "already addressed" by the 2019 Proposed Rule. John Goodin, Director of EPA Office of Wetlands, Oceans, and Watersheds, "Memorandum to the Record RE: EPA Science Advisory Board Draft Commentary," (Jan. 22, 2020)[10] ("Goodin Memo") (stating "[a]s the Army and EPA made clear in the proposed WOTUS rule preamble… the fundamental bases for this rule are the text and structure of the CWA and the constitutional boundaries within which Congress enacted the CWA... science cannot be used to draw the line between Federal and State waters, as those are legal distinctions[.]").

114.    On February 27, 2020, the EPA Science Advisory Board submitted its final comments opposing the 2019 Proposed Rule and reiterating all the concerns previously stated in its draft comments. Final Comments of EPA Science Advisory Board (Feb. 27, 2020).[11]

**The 2020 Final Rule**

115.    On April 21, 2020, the Agencies completed their two-step repeal and replace process with the promulgation of the 2020 Final Rule. *See* 85 Fed. Reg. 22,250 (Apr. 21, 2020).

116.    As directed by EO 13778, the 2020 Final Rule relies repeatedly on the *Rapanos* plurality opinion to adopt a very narrow definition of "waters of the United States," which

---

[10] Docket No. EPA-HQ-OW-2018-0149-11589. Accessible at: https://downloads.regulations.gov/EPA-HQ-OW-2018-0149-11589/content.pdf
[11] The 2020 Final Rule's rulemaking docket does not include these final comments. However, they are accessible elsewhere on EPA's website at:
https://yosemite.epa.gov/sab/sabproduct.nsf/WebBOARD/729C61F75763B8878525851F00632D1C/$File/EPA-SAB-20-002+.pdf

effectively reversed nearly every iteration of the Agencies' regulations and guidance implementing the Clean Water Act since the enactment of the Act itself in 1972.

117.    The 2020 Final Rule discards the *Rapanos* "significant nexus" standard entirely, and reduces "waters of the United States" to four bright-line categories of waters: (1) the territorial seas and waters that are, were, or may be susceptible to use in interstate or foreign commerce; (2) certain tributaries of these waterways; (3) certain lakes and ponds, and impoundments of jurisdictional waters; and (4) wetlands "adjacent" to those categories of waters. 2020 Final Rule at 22,338.

118.    Even within those categories, the 2020 Final Rule narrows the scope of jurisdiction further. For example, the Agencies define "adjacent" to include only those wetlands that either abut or share a direct surface-water connection with navigable waters. *Id.* at 22,313.

119.    The 2020 Final Rule also categorically excludes any upstream waters connected to jurisdictional waters through a subsurface hydrological connection—including wetlands sharing a shallow subsurface hydrological connection with jurisdictional waters, which a majority of Justices in *Rapanos* held <u>could</u> be jurisdictional per the "significant nexus" test.

120.    The 2020 Final Rule also eliminates "interstate" waters as a category of jurisdiction entirely, excluding many waters that cross state borders and that EPA has expressly interpreted as subject to CWA jurisdiction since its enactment. *See* 2020 Final Rule at 22,338.

121.    The 2020 Final Rule did not address the substance of the EPA Science Advisory Board's comments or offer any evidentiary support for the Agencies' approach. Instead, the 2020 Final Rule merely reiterated the Agencies' position that "science cannot dictate where to draw the line between Federal and State waters, as this is a legal question that must be answered based on the overall framework and construct of the CWA… the final rule is consistent with the text,

structure, legislative history, and applicable Supreme Court guidance." 2020 Final Rule at

22,262.

122.    The Agencies' justification for the 2020 Final Rule's determination that

subsurface hydrology or discharges into or through groundwater that subsequently migrate into

navigable waters do not provide a basis for jurisdiction is merely that "subsurface connections as

a basis for CWA jurisdiction would be overinclusive and would encroach on State and tribal

authority over land and water resources" and "could also be confusing and difficult to

implement." *Id.* at 22,313.

123.    In response to voluminous public comments objecting to the Agencies' failure to

consider any relevant scientific evidence, the Agencies conceded that "the [2015] Connectivity

Report" summarizes the current scientific understanding about the connectivity and mechanisms

by which streams and wetlands affect the physical, chemical, and biological integrity of

downstream waters and that connections occur along a gradient" and "recognize[d] the

importance of protecting water resources and as a general matter do not dispute the important

role of headwaters" in the integrity of downstream jurisdictional waters. EPA, Response to

Comments (Apr. 21, 2020) ("Response to Comments"), Topic 1: Legal Arguments, at 114-115.[12]

124.    The Agencies asserted they were precluded from relying on those reports because

"science cannot dictate where to draw the line between federal and state or tribal waters[.]" *Id.*

125.    Many commenters also objected to the 2019 Proposed Rule on the basis that the

Agencies had failed to perform an adequate Economic Assessment or Resource and

Programmatic Assessment, and that the Agencies had provided insufficient justifications for

discarding the quantitative economic and programmatic analyses conducted in support of the

---

[12] Docket No. EPA-HQ-OW-2018-0149-11574, Attachment 1. Accessible at:
https://downloads.regulations.gov/EPA-HQ-OW-2018-0149-11574/attachment_1.pdf

2015 Clean Water Rule—which had included a quantitative analysis of potential environmental benefits and costs. Response to Comments, Topic 11: Economic Analysis and Resource and Programmatic Assessment, at 1-2.[13]

126.    The Agencies themselves admitted that they were only able to perform broadly "qualitative… national-level estimates" of costs (which were themselves based on numerous unsupported assumptions by the Agencies, such as what the Agencies believed would be the "predicted state response[s]" to the 2020 Final Rule), and that the Agencies "were unable to quantify the change in CWA jurisdiction" resulting from the 2020 Final Rule's novel exclusion of broad categories of waters "when comparing the proposed rule to the 2015 [Clean Water] Rule or pre-existing regulations." *Id.* at Topic 1, pgs. 2-3.

127.    The Agencies asserted that these deficiencies were not relevant because the 2020 Final Rule "is not based on the information in the agencies' [Economic Assessment] or [Resource and Programmatic Assessment]" but "grounded in [the Agencies'] legal analysis of the limits on CWA jurisdiction reflected in the statute and Supreme Court case law. The agencies are precluded from exceeding their authority under the CWA to achieve specific scientific, policy, or other outcomes." *Id.* at Topic 1, pg. 3.

128.    The Agencies also rejected comments noting that a majority of Justices in *Rapanos* had explicitly rejected a surface-water connection requirement for federal jurisdiction as "inconsistent" with the CWA, and merely asserted—without explanation—that the 2020 Final Rule's surface-water connection requirement "is based on the text, structure, and legislative history of the CWA and the core principles and concepts set forth in the three Supreme Court cases addressing the scope of the phrase 'waters of the United States.'" *Id.*

---

[13] Docket No. EPA-HQ-OW-2018-0149-11574, Attachment 11. Accessible at: https://downloads.regulations.gov/EPA-HQ-OW-2018-0149-11574/attachment_11.pdf

129.    The Agencies additionally rejected comments noting the Agencies had improperly

discarded the "significant nexus" standard articulated by the Supreme Court in *Rapanos*, and

argued that the Agencies' interpretation was easier to administer:

> Although the agencies considered Justice Kennedy's 'significant nexus' test when
> developing the final rule, the agencies disagree that a significant nexus standard
> should be a component of the definition of 'waters of the United States…' The
> agencies acknowledge that field work may frequently be necessary to verify
> whether a feature is a 'water of the United States'; however, replacing the
> significant nexus analysis with categorically jurisdictional and categorically
> excluded waters in the final rule is inherently less complicated than a complex,
> multi-factored significant nexus test that must be applied on a case-by case basis to
> countless waters and wetlands across the nation.

*Id.*

130.    The Agencies' Response to Comments and the 2020 Final Rule itself repeatedly

state that the 2020 Final Rule's "fundamental bas[is]" is the Agencies' "unifying legal theory for

federal jurisdiction,"  which "preserves the traditional sovereignty of states over their own land

and water resources," "provides clarity and predictability," and "is intended to ensure that the

agencies operate within the scope of the federal government's authority over navigable waters

under the CWA and the Commerce Clause of the U.S. Constitution." 2020 Final Rule at 22,252.

131.    The 2020 Final Rule makes clear that the Agencies' "legal theory for federal

jurisdiction" is not actually based upon the text of the CWA itself, but is instead largely based

upon the Agencies' broad legal interpretations regarding the scope of "Congress' authority to

regulate navigable waters… under the Commerce Clause" of the Constitution, 2020 Final Rule at

22,262 (emphasis added), and "the outer limits of Congress' constitutional authority" under the

Commerce Clause. *Id.* at 22,256 (emphasis added).

132.    The Agencies, by their own admission, have not relied on the Economic

Assessment, the Resource and Programmatic Assessment, the prevailing science, or the

recommendations of its own experts as a basis for the final rule, and have discarded the

"significant nexus" test endorsed by a majority of Justices in *Rapanos* and first articulated in *SWANCC*, 531 U.S. at 167.

133.    The 2019 Proposed Rule, 2020 Final Rule, and the Agencies' Response to Comments all make clear that the 2020 Final Rule is premised entirely upon the Agencies' "legal theory" regarding the scope of "the federal government's authority over navigable waters under the CWA and the Commerce Clause of the U.S. Constitution," and the Agencies' position that the CWA categorically precludes the Agencies from considering certain factors, such as subsurface hydrological connections, as a basis for jurisdiction. 2020 Final Rule at 22,252.

### *County of Maui*

134.    On April 23, 2020, the Supreme Court decided *Cty. of Maui, Hawaii v. Hawaii Wildlife Fund*, 140 S. Ct. 1462 (2020)—in which the Court ruled on whether the CWA requires a NPDES permit "'when pollutants originate from a point source but are conveyed to navigable waters by a nonpoint source,' here, 'groundwater.'" *Id.* at 1468.

135.    The Solicitor General joined as *amicus curiae* to advance EPA's most recent interpretation of the CWA as categorically excluding jurisdiction over any pollutants that travel through subsurface connections to jurisdictional surface waters. *Id.* at 1470.

136.    The Solicitor General asserted that because EPA now interpreted the CWA to preclude federal authority over groundwater, jurisdiction under the CWA—including the NPDES permit requirement—"does not apply if a pollutant… must travel through any amount of groundwater before reaching navigable waters." *Id*. at 1473.

137.    A six-Justice majority of the Court unambiguously rejected EPA's interpretation, and held that federal jurisdiction under the CWA encompasses "pollutants that reach navigable

waters after traveling through groundwater if that discharge is the functional equivalent of a direct discharge from the point source into navigable waters." *Id.* at 1477.

138.   The Court stated that EPA's position was "difficult to reconcile" with the statutory text of the CWA, which "alludes to no exception for discharges through groundwater." *Id.* at 1474. "We do not see how Congress could have intended to create such a large and obvious loophole in one of the key regulatory innovations of the Clean Water Act." *Id.* at 1473.

139.   The Court further held that EPA's views were due no deference at all, precisely because "EPA's reading would open a loophole allowing easy evasion of the [CWA's] basic purposes. Such an interpretation is neither persuasive nor reasonable." *Id.* at 1474.

140.   In rejecting EPA's claim that the CWA granted *exclusive* jurisdiction over *all* subsurface flow to the States, the Court noted it was "difficult to reconcile EPA's interpretation" with provisions clearly contemplating some degree of federal jurisdiction over such waters. *Id.* at 1475 ("In short, EPA's oblique argument about the statute's references to groundwater cannot overcome the statute's structure, its purposes, or the text of the provisions that actually govern.").

141.   The Court also rejected EPA's ease of administration argument as a basis for deference, and noted that it was EPA's duty to examine the "factors that may prove relevant (depending upon the circumstances of a particular case)":

> As we have said (repeatedly)… context imposes natural limits as to when a point source can properly be considered the origin of pollution that travels through groundwater… The difficulty with this approach, we recognize, is that it does not, on its own, clearly explain how to deal with middle instances. But there are too many potentially relevant factors applicable to factually different cases for this Court now to use more specific language… we recognize that a more absolute position… may be easier to administer. But, as we have said, those positions have consequences that are inconsistent with major congressional objectives, as revealed by the statute's language, structure, and purposes.

*Id.* at 1476.

142.    Finally, the Court rejected EPA's claim that CWA jurisdiction over discharges through groundwater "would vastly expand the scope of the statute," noting that it was contradicted by the fact that "EPA has applied the permitting provision to some (but not to all) discharges through groundwater for over 30 years… In that time we have seen no evidence of unmanageable expansion." *Id*. at 1477.

143.    Though the facts of *County of Maui* involved a point source discharge, and not the definition of WOTUS, both situations are affected by EPA's position regarding whether subsurface migration of pollutants "through any amount of groundwater before reaching navigable waters" automatically breaks CWA jurisdiction. *Id*. at 1473. In *County of Maui*, the Supreme Court held that it does not, directly contradicting EPA's position regarding subsurface hydrology with respect to Waters of the United States in the 2020 Final Rule.

## FIRST CAUSE OF ACTION

**Violation of the Administrative Procedure Act, 5 U.S.C. § 706
Not Otherwise in Accordance with Law
The Agencies' Interpretation of "Waters of the United States" Has Been
Unambiguously Foreclosed by *Rapanos* and *County of Maui***

144.    Plaintiffs incorporate by reference in this claim the allegations in all preceding paragraphs of the Complaint.

145.    The APA provides that this Court "shall… hold unlawful and set aside agency action, findings, and conclusions found to be… arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law." 5 U.S.C. § 706(2)(A).

146.    Agency action is not in accordance with law if the agency fails to interpret and implement the statutory language in a manner consistent with the statute's text, structure, and purpose, and with controlling Supreme Court precedent. *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 934 F.3d 649, 662 (D.C. Cir. 2019) (courts "presume that Congress would not

38

authorize the promulgation of an '[im]permissible construction'" and "set aside agency actions based on such a construction.") (quoting *Chevron*, 467 U.S. at 843).

147.    The Agencies based the 2020 Final Rule's revised jurisdictional definitions—such as the requirement that a wetland either abut or share a direct surface-water connection with a jurisdictional water— upon the plurality opinion in *Rapanos*, which the majority rejected as "inconsistent with the Act's text, structure, and purpose." *Rapanos*, 547 U.S. at 776.

148.    In doing so, the Agencies discarded the "significant nexus" test actually endorsed by a majority of Justices in *Rapanos*, on the grounds that the Agencies "disagree[d]" and felt that their own bright-line interpretation of the CWA was "less complicated" and easier to administer.

149.    In *County of Maui*, a clear, six-Justice majority of the Court again unambiguously rejected EPA's interpretation of CWA jurisdiction as categorically excluding any waters connected to jurisdictional waters via subsurface hydrology as inconsistent with the CWA and "neither persuasive nor reasonable." *Cty. of Maui*, 140 S. Ct. at 1476.

150.    "The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." *Chevron*, 467 U.S. at 843 n.9; *see also Brand X*, 545 U.S. at 982-983 (stating that "a judicial precedent holding that the statute unambiguously forecloses the agency's interpretation, and therefore contains no gap for the agency to fill, displaces a conflicting agency construction.").

151.    A majority of Justices in both *Rapanos* and *County of Maui* held that the text of the CWA itself "unambiguously foreclose[d]" EPA's interpretation of the CWA as categorically excluding *any and all* discharges through groundwater or subsurface hydrology from jurisdiction. *Cty. of Maui*, 140 S. Ct. at 1476; *Rapanos*, 547 U.S. at 776.

152.    In the 2020 Final Rule, the Agencies interpreted the CWA as categorically excluding any discharges through groundwater or subsurface hydrology from jurisdiction, and in doing so excluded all considerations of science, especially regarding subsurface hydrology, and the views of their experts.

153.    The 2020 Final Rule is therefore an unlawful and impermissible interpretation of "waters of the United States" under the CWA, and contravenes the statute's text, structure, and purpose, and controlling Supreme Court precedent. *See Chevron*, 467 U.S. at 843 n.9 ("If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect."); *see also Util. Air Regulatory Grp. v. E.P.A.*, 573 U.S. 302, 321 (2014) "[A]n agency interpretation that is inconsisten[t] with the design and structure of the statute as a whole… does not merit deference.") (internal quotes and punctuation omitted); *Cty. of Maui*, 140 S. Ct. at 1476; *Rapanos*, 547 U.S. at 776.

154.    For these reasons, the 2020 Final Rule is not in accordance with law pursuant to 5 U.S.C. § 706(2)(A) and must be set aside by this Court.

**SECOND CAUSE OF ACTION**

**Violation of the Administrative Procedure Act, 5 U.S.C. § 706**
**Arbitrary and Capricious**
**The Agencies Failed to Consider Numerous Relevant and Important Factors**

155.    Plaintiffs incorporate by reference in this claim the allegations in all preceding paragraphs of the Complaint.

156.    The APA provides that this Court "shall… hold unlawful and set aside agency action, findings, and conclusions found to be… arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law." 5 U.S.C. § 706(2)(A). The APA further mandates that

each agency "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43.

157.    An agency rule is arbitrary and capricious if the agency has either "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

158.    Numerous provisions of the CWA reiterate and emphasize that the Agencies must consider chemical and biological factors in implementing the Act. *See, e.g.*, 33 U.S.C. § 1362(19) (defining "pollution" under the Act to mean any "man-made or man-induced alteration of the chemical, physical, biological, and radiological integrity of water"); 33 U.S.C. §§ 1311, 1312(a), 1313, 1314 (stating that the EPA Administrator "shall" establish effluent limitations—defined as restrictions on "quantities, rates, and concentrations of chemical, physical, biological, and other constituents" of pollutant discharges, 33 U.S.C. § 1362(11)—whenever the Administrator determines that such discharges would interfere with "the attainment or maintenance" of water quality of any portion of the navigable waters); 33 U.S.C. § 1314(a)(1)-(2) (the Administrator "shall develop and publish… (and from time to time thereafter revise) criteria for water quality accurately reflecting the latest scientific knowledge" on the chemical and biological effects of pollutants, and information "on the factors necessary to restore and maintain the chemical, physical, and biological integrity of all navigable waters, ground waters, waters of the contiguous zone, and the oceans.").

159.    The Supreme Court has established that where a statute identifies multiple relevant factors an agency must consider, the agency must consider "all the relevant factors," and "may not 'entirely fai[l] to consider an important aspect of the problem' when deciding whether regulation is appropriate." *Michigan v. E.P.A.,* 135 S. Ct. 2699, 2707 (2015) (quoting *State Farm*, 463 U.S. at 43); *see, e.g.*, *Carlson v. Postal Regulatory Comm'n*, 938 F.3d 337, 344 (D.C. Cir. 2019) ("Even when an agency has significant discretion in deciding how much weight to accord each statutory factor, that does not mean it is free to ignore any individual factor entirely.") (internal quotation omitted).

160.    Waterbodies are entitled to protection under the CWA if they share a "significant nexus" to navigable waters. *SWANCC*, 531 U.S. at 167; *Rapanos*, 547 U.S at 779. Further, Justice Kennedy and the four dissenting Justices in *Rapanos* made clear that this nexus "must be assessed in terms of the statute's goals and purposes… to 'restore and maintain the chemical, physical, and biological integrity of the Nation's waters." *Rapanos*, 547 U.S at 779 (quoting 33 U.S.C. § 1251(a)).

161.    The Agencies, by their own repeated admission, have not relied on the Economic Assessment, the Resource and Programmatic Assessment, the prevailing science, or the recommendations of its own experts in developing the 2020 Final Rule.

162.    The Agencies admit they did not perform an adequate Economic Analysis including a cost-benefit analysis for foregone environmental benefits or a Resource and Programmatic Assessment—despite acknowledging that the 2020 Final Rule will result in a significant reduction in protections for waters over which the Agencies have traditionally asserted CWA jurisdiction since the statute was enacted in 1972.

163.    The Agencies also acknowledge that the 2020 Final Rule contradicts the scientific

evidence and recommendations compiled and provided by the Agencies own experts—at the

Agencies' request—including the 2015 Connectivity Report developed in support of the 2015

Clean Water Rule and the EPA Science Advisory Board's comments objecting to the 2019

Proposed Rule as unsupported by evidence. *See* Draft Comments of the EPA Science Advisory

Board *supra* note 7; Final Comments of the EPA Science Advisory Board *supra* note 11.

164.    The Agencies justified the failure to consider these factors by asserting that these

factors were not relevant, because "the fundamental bases for this rule [are] the text and structure

of the CWA and the constitutional boundaries within which Congress enacted the CWA." 2020

Final Rule at 22,270; *see also* Goodin Memo *supra* note 10.

165.    The Agencies' interpretation of the CWA eliminates the "significant nexus"

analysis entirely and excludes consideration of any factors beyond a purely physical, categorical

surface-water connection distinction.

166.    The interpretive flexibility afforded to agencies does not permit agencies to deem

certain factors listed by statute "irrelevant" to the decision whether to regulate. *Michigan v.

E.P.A.,* 135 S. Ct. at 2708 ("*Chevron* allows agencies to choose among competing reasonable

interpretations of a statute; it does not license interpretive gerrymanders under which an agency

keeps parts of statutory context it likes while throwing away parts it does not.").

167.    As a result of the Agencies' failure to consider numerous relevant and crucial

factors—or indeed, any factors—the 2020 Final Rule is arbitrary and capricious pursuant to 5

U.S.C. § 706(2)(A) and must be set aside by this Court.

## THIRD CAUSE OF ACTION

### Violation of the Administrative Procedure Act, 5 U.S.C. § 706
### Arbitrary and Capricious
### The Agencies Provide No Basis, Let Alone a Reasonable One, Justifying Their
### Departure from Scientific Evidence, Prior Factual Findings, or Policy and Practice

168.    Plaintiffs incorporate by reference in this claim the allegations in all preceding

paragraphs of the Complaint.

169.    The APA provides that this Court "shall… hold unlawful and set aside agency

action, findings, and conclusions found to be… arbitrary, capricious, an abuse of discretion, or

not otherwise in accordance with law." 5 U.S.C. § 706(2)(A). An agency must articulate a

reasoned explanation for promulgating a rule reversing long-standing policy or practice, at a

minimum demonstrating that there are "good reasons" for the change and that the "new policy is

permissible under the statute." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16

(2009).

170.    An agency may be required to provide an even more detailed justification if those

prior policies have "engendered serious reliance interests that must be taken into account… in

such cases, it will be arbitrary and capricious to fail to consider these factors." *Id.* "An

'[u]nexplained inconsistency' in agency policy is 'a reason for holding an interpretation to be an

arbitrary and capricious change from agency practice.'" *Encino Motorcars*, 136 S. Ct. at 2126

(quoting *Brand X,* 545 U.S. at 981).

171.    In promulgating the 2020 Final Rule, the Agencies ignored and retracted without

reasoned explanation their prior factual findings, including the 2015 Connectivity Report, the

repeated, strong recommendations of EPA's Science Advisory Board, and the extensive factual

record and findings developed in support of EPA's 2015 Clean Water Rule.

172.     The Agencies also failed to provide any reasoned explanation for abandoning their own long-standing policy and practice of interpreting "waters of the United States" in compliance with the significant nexus standard as set forth in the 2008 *Rapanos* Guidance and the 2015 Clean Water Rule, and of including all interstate waters within the scope of waters protected by the CWA since its enactment.

173.     The Agencies also failed to consider and take into account the serious reliance interests engendered by the Agencies' prior long-standing policy and position regarding the scope of the "waters of the United States" definition.

174.     The Agencies have variously claimed three "reasonable" bases for their abrupt departure from established policy: a "change in administration," "ease of administration," and the Agencies' own legal interpretations of the CWA.

175.     While a change in administration is an acceptable basis for an agency to *reconsider* its policies, it is not itself a "reasoned basis" justifying final agency action; the agency's "reasoned explanation for its action," must include, at a minimum, a demonstration that "the new policy is permissible under the statute, [and] that there are good reasons for it." *Fox,* 556 U.S. at 515; *see also State Farm*, 463 U.S. at 43 (the APA requires agencies to demonstrate that they have "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'").

176.     The policy preferences of the Executive resulting from a "change in administration" cannot constitute a "reasoned explanation" justifying the Agencies' departure from the plain text, structure, legislative history, and statutory objectives of the Act they are charged with faithfully executing. "The power of executing the laws… does not include a power to revise clear statutory terms." *Util. Air Regulatory Grp.*, 573 U.S. at 327.

177.    Similarly, complexity or administrative burden cannot "amount to a reasoned justification for declining to form a scientific judgment" required by statute. *Massachusetts v. E.P.A.*, 549 U.S. 497, 533-4 (2007); *see also Cty. of Maui*, 140 S. Ct. at 1476 (rejecting EPA's argument that its interpretation was "easier to administer"). Numerous substantive provisions of the CWA clearly require EPA to make such scientific judgments. *See, e.g.*, 33 U.S.C. § 1312(a) (requiring the Administrator to establish effluent limitations whenever, "in the judgment of the Administrator," such limits are necessary to achieve "the attainment or maintenance" of water quality in any portion of navigable waters); 33 U.S.C. § 1343(c)(2) (stating in "any event where insufficient information exists on any proposed discharge to make a reasonable judgment" pursuant to the guidelines established by the EPA Administrator for ocean discharges, "no [NPDES] permit shall be issued.").

178.    Finally, the Agencies' own legal analysis is not a "reasonable basis" for their legal interpretation of the CWA because, as discussed above, that interpretation contravenes the text, structure, and purpose of the Act and controlling Supreme Court precedent and is "neither persuasive nor reasonable." *Cty. of Maui*, 140 S. Ct. at 1476.

179.    Under the standards established by *Fox*, *Massachusetts v. E.P.A.*, and *State Farm*, the Agencies' articulated reasons for departure from previous policy and established scientific judgment constitute unlawful arbitrary and capricious decision-making under § 706(2)(A) of the APA.

180.    For the above reasons, the 2020 Final Rule is arbitrary and capricious, and must be set aside by this Court.

## FOURTH CAUSE OF ACTION

**Violation of the Administrative Procedure Act, 5 U.S.C. § 706
Arbitrary and Capricious, and in Excess of the Agencies' Statutory Jurisdiction
The 2020 Final Rule Is Premised on the Consideration of Factors Not Contemplated
or Authorized by the Clean Water Act**

181.    Plaintiffs incorporate by reference in this claim the allegations in all preceding

paragraphs of the Complaint.

182.    The APA provides that this Court "shall… hold unlawful and set aside agency

action, findings, and conclusions found to be" either "arbitrary, capricious, an abuse of

discretion, or not otherwise in accordance with law" or "in excess of statutory jurisdiction,

authority, or limitations[.]" 5 U.S.C. § 706(2)(A), (C).

183.    "[A]n agency literally has no power to act… unless and until Congress confers

power upon it." *Louisiana Pub. Serv. Comm'n*, 476 U.S. at 357. Only "agency determinations

within the scope of delegated authority are entitled to deference," and "it is fundamental 'that an

agency may not bootstrap itself into an area in which it has no jurisdiction.'" *Adams Fruit*, 494

U.S. at 650 (quoting *Federal Maritime Comm'n v. Seatrain Lines, Inc.,* 411 U.S. at 745).

184.    Thus, an agency rule is arbitrary and capricious if the agency has "relied on

factors which Congress has not intended it to consider," *State Farm*, 463 U.S. at 43, and a court

must reject agency actions based upon an impermissible construction as "not in accordance with

law" or "in excess of statutory jurisdiction." *Am. Bankers Ass'n*, 934 F.3d at 662 (courts

"presume that Congress would not authorize the promulgation of an '[im]permissible

construction' of a statute.") (quoting *Chevron*, 467 U.S. at 843).

185.    The 2020 Final Rule diminishes the Act's core objective—"to restore and

maintain the chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C. §

1251(a)—instead prioritizing "those policies that [the Agencies] deem most important in shaping

47

the jurisdiction of the CWA," such as the "autonomy of the States" and "the right of the public to clear limits to agency authority." 2019 Proposed Rule at 4197.

186.    Further, the 2019 Proposed Rule, the 2020 Final Rule, and the Agencies' Response to Comments make clear that the 2020 Final Rule is premised entirely upon the Agencies' "unifying legal theory for federal jurisdiction," which they argue "preserves the traditional sovereignty of states over their own land and water resources," "provides clarity and predictability," and "is intended to ensure that the agencies operate within the scope of the federal government's authority… under the CWA and the Commerce Clause of the U.S. Constitution." Response to Comments, Topic 1: Legal Arguments at 121-122.

187.    It is not the Agencies' role in implementing the CWA to speculate on the "constitutional authority" of the Executive, Legislative, or Judicial branches—it is only to interpret the scope of their own delegated authority, and they may not "bootstrap" themselves "into an area in which [they] ha[ve] no jurisdiction.'" *Adams Fruit Co.*, 494 U.S. at 650 (the delegated authority to "administer[]" a statute and "promulgate *standards* implementing [its] provisions… does not empower [an agency] to regulate the scope of judicial power vested by the statute."); *see also United States Telecom Ass'n v. Fed. Commc'ns Comm'n*, 855 F.3d 381, 414 (D.C. Cir. 2017) ("The lawmaking power belongs exclusively to Congress, not to agencies.").

188.    In particular, nothing in the text of the CWA supports the Agencies' position that Congress intended the Agencies, in implementing the Act, to broadly reinterpret the scope of "Congress' authority to regulate navigable waters… under the Commerce Clause," 2020 Final Rule at 22,262 (emphasis added), or the "the outer limits of Congress' constitutional authority." *Id.* at 22,256 (emphasis added). Determining the constitutionality of a Congressional act is a

function solely reserved to the Judiciary, and "is the gravest and most delicate duty that [the Judiciary] is called on to perform." *Blodgett v. Holden*, 275 U.S. 142, 147–48 (1927).

189.     The Agencies have similarly failed to provide any evidence in the record that would support the Agency's claims that Congress intended "the autonomy of States," "clarity for the regulated community," "ease of administration," or "the right of the public to clear limits to agency authority" to be the "most important" criteria "shaping the jurisdiction of the CWA."

190.     To the contrary, Congress enacted the CWA expressly to " repudiate limits that had been placed on federal regulation by earlier water pollution control statutes" and in recognition that "[p]rotection of aquatic ecosystems… demanded broad federal authority to control pollution," *Riverside Bayview*, 474 U.S. at 132-33, and the Act authorizes the Agencies to regulate discharges whenever they, "in the judgment of the Administrator… would interfere with the attainment or maintenance of" water quality in the navigable waters. 33 U.S.C. § 1311(a); *see also* 33 U.S.C. § 1252(a) ("The Administrator shall, after careful investigation… prepare or develop comprehensive programs for preventing, reducing, or eliminating the pollution of the navigable waters and ground waters[.]").

191.     The CWA's substantive permitting provisions make clear that the EPA Administrator is charged with ensuring compliance with the Act and allows EPA to delegate its authority to a State "*only if* the State (among other things) provides 'adequate authority'" to ensure such compliance. *Cty. of Maui*, 140 S. Ct. at 1475; *see, e.g.*, 33 U.S.C. § 1342(a) (authorizing EPA Administrator to require NPDES permits to meet "such conditions as the Administrator determines are necessary to carry out" the Act); 33 U.S.C. § 1342(b)-(c) (conditioning State administration of NPDES program on approval of the Administrator, and authorizing the Administrator to revoke State authority upon determination that it does not

conform to federal requirements); 33 U.S.C. § 1370 ("Except as expressly provided in this chapter… State or political subdivision[s] or interstate agencies may not adopt or enforce any" standards or requirements "less stringent" than those established under the CWA.).

192.     Nothing in the CWA empowers the Agencies to implement it in a manner that would ignore Congress' overriding purpose—"restor[ing] and maintain[ing] the chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C. § 1251(a)—in favor of "those policies that [the Agencies] deem most important in shaping the jurisdiction of the CWA." 2019 Proposed Rule at 4169.

193.     The Agencies' assertion that a "change in administration" alone can be a "perfectly reasonable basis" for the 2020 Final Rule—effectively overriding the intent of Congress and insulating the 2020 Final Rule from judicial review—raises substantial separations of powers concerns. "[T]he courts are the final authorities on issues of statutory construction… and 'are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute.'" *S.E.C. v. Sloan*, 436 U.S. 103, 118 (1978) (quoting *NLRB v. Brown,* 380 U.S. 278, 291 (1965)); *see also City of Arlington, Tex. v. F.C.C.*, 569 U.S. 290, 327 (2013) (dissent of Chief Justice Roberts) (The Judiciary's "task is to fix the boundaries of delegated authority," and "that is not a task [the Judiciary] can delegate to the agency… We do not leave it to the agency to decide when it is in charge.").

194.     Because the 2020 Final Rule prioritizes "those policies that [the Agencies] deem most important" in lieu of following the Act's clear statutory commands and text, the 2020 Final Rule is both arbitrary and capricious and exceeds the Agencies' statutory jurisdiction and authority under the CWA and must be set aside by this Court.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs respectfully request that this Court:

1.      Declare that the 2020 Final Rule is arbitrary, capricious, and otherwise not in accordance with law;

2.      Declare that the 2020 Final Rule exceeds the Agencies' statutory jurisdiction under the Clean Water Act;

3.      Vacate and set aside the 2020 Final Rule as unlawful;

4.      Award Plaintiffs their reasonable fees, costs, expenses, and disbursements, including attorneys' fees, associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d); and

5.      Award Plaintiffs any such additional relief as the Court may deem just, proper, or necessary.


Respectfully submitted this the 25th Day of June, 2020,


/s/  *Mary Greene*_____
Mary E. Greene
DC Bar Identification No. 987644
Environmental Integrity Project
1000 Vermont Avenue, NW, Suite 1100
Washington, DC 20005
Telephone: (202) 263-4449
mgreene@environmentalintegrity.org

*Counsel for Plaintiffs*