**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

ENVIRONMENTAL INTEGRITY
PROJECT, *et al.*,

               *Plaintiffs*,

      v.

  MICHAEL REGAN, *et al.*,

              *Defendants*,

        & 

AMERICAN FARM BUREAU FEDERATION,
*et al.,*

              *Intervenors-Defendants*.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 1:20-cv-1734
(Calendar Committee)

# Business Intervenor-Defendants' Response In Support of Agencies' Motion for Voluntary Remand Without Vacatur

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ..................................................................................................................1

FACTUAL AND LEGAL BACKGROUND ........................................................................4

    A.    Statutory and Regulatory Background. ...................................................................4

    B.    The Unlawful 2015 Rule. ........................................................................................7

    C.    The 2019 Repeal Rule and 2020 Navigable Waters Protection Rule. ....................8

    D.    This Litigation. ......................................................................................................10

ARGUMENT ......................................................................................................................11

    A.    The Agencies Are Entitled To Voluntary Remand. ..............................................11

    B.    Remand Without Vacatur Is Appropriate. .............................................................13

        1.    Vacatur would cause serious disruption and harm. ..................................15

        2.    Remand without vacatur will not prejudice plaintiffs. ..............................17

CONCLUSION ...................................................................................................................18

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*,
  988 F.2d 146 (D.C. Cir. 1993) ....................................................................1, 11, 13

*Am. Petroleum Inst. v. EPA*,
  683 F.3d 382 (D.C. Cir. 2012) ................................................................................12

*B.J. Alan Co. v. ICC*,
  897 F.2d 561 (D.C. Cir. 1990) ................................................................................12

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*,
  781 F.3d 1271 (11th Cir. 2015) ........................................................................14, 15

*California Cmtys. Against Toxics v. U.S. E.P.A.*,
  688 F.3d 989 (9th Cir. 2012) ............................................................................11, 12

*California v. Wheeler*,
  467 F. Supp. 3d 864 (N.D. Cal. 2020) ..................................................................1, 15

*\*Carpenters Indus. Council v. Salazar*,
  734 F. Supp. 2d 126 (D.D.C. 2010) ...................................................................11, 13

*Commonwealth of Pennsylvania v. ICC*,
  590 F.2d 1187 (D.C. Cir. 1978) ..............................................................................12

*In re EPA & Dep't. of Def. Final Rule*,
  803 F.3d 804 (6th Cir. 2015) .....................................................................................8

*Georgia v. Pruitt*,
  326 F. Supp. 3d 1356 (S.D. Ga. 2018) .......................................................................8

*Georgia v. Wheeler*,
  418 F. Supp. 3d 1336 (S.D. Ga. 2019) ...................................................................8, 17

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*,
  138 S. Ct. 617 (2018) .................................................................................................8

*Nat'l Parks Conservation Ass'n v. Jewell*,
  62 F. Supp. 3d 7 (D.D.C. 2014) ..............................................................................13

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Nat'l Parks Conservation Ass'n v. Salazar,*
  660 F. Supp. 2d 3 (D.D.C. 2009) ...........................................................................13

*North Dakota v. EPA,*
  127 F. Supp. 3d 1047 (D.N.D. 2015) .......................................................................8

*Rapanos v. United States,*
  547 U.S. 715 (2006) .................................................................................5, 6, 7

*Sackett v. EPA,*
  566 U.S. 120 (2012) ......................................................................................6

*Shands Jacksonville Med. Ctr. v. Burwell,*
  139 F. Supp. 3d 240 (D.D.C. 2015) ...............................................................1, 13, 14

*Sierra Club v. Antwerp,*
  560 F. Supp. 2d 21 (D.D.C. 2008) ..................................................................11, 12

*SKF USA Inc. v. United States,*
  254 F.3d 1022 (Fed. Cir. 2001) ................................................................1, 11, 12

*Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers,*
  531 U.S. 159 (2001) ......................................................................................5

*Texas v. EPA,*
  389 F. Supp. 3d 497 (S.D. Tex. 2019) ................................................................8, 17

*U.S. Army Corps of Eng'rs v. Hawkes, Co.,*
  136 S. Ct. 1807 (2016) ...................................................................................6

*United States v. Riverside Bayview Homes, Inc.,*
  474 U.S. 121 (1985) ......................................................................................5

*Util. Solid Waste Activities Grp. v. EPA,*
  901 F.3d 414 (D.C. Cir. 2018) ...........................................................................12

*Vanda Pharms., Inc. v. FDA,*
  2019 WL 1198703 (D.D.C. Mar. 14, 2019) ...............................................................14

*WildEarth Guardians v. Bernhardt,*
  2020 WL 6255291 (D.D.C. Oct. 23, 2020) ............................................................13, 14

**Statutes, Rules, and Regulations**

5 U.S.C. § 706(a) .........................................................................................13

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

33 U.S.C. § 1251(a) ...................................................................................................4

33 U.S.C. § 1251(b) ...................................................................................................4

33 U.S.C. § 1311(a) ...................................................................................................4

33 U.S.C. § 1362(7) ...................................................................................................4

33 U.S.C. § 1362(12)(A) ...........................................................................................4

Permits for Activities in Navigable Waters for Ocean Waters, 39 Fed. Reg. 12,115
    (Apr. 3, 1974) ......................................................................................................4

Regulatory Programs of the Corps of Engineers, 42 Fed. Reg. 37,122 (July 19,
    1977) ....................................................................................................................4

Clean Water Rules: Definition of "Waters of the United States," 80 Fed. Reg.
    37,054 (June 29, 2015)........................................................................................7

Definition of "Waters of the United States"—Recodification of Pre-Existing
    Rules, 82 Fed. Reg. 34,899 (July 27, 2017) ......................................................8

Definition of "Waters of the United States"—Recodification of Preexisting Rule,
    83 Fed. Reg. 32,227 (July 12, 2018)...................................................................9

Definition of "Waters of the United States"—Recodification of Pre-Existing
    Rules, 84 Fed. Reg. 56,626 (Oct. 22, 2019).......................................................9

The Navigable Waters Protection Rule: Definition of "Waters of the United
    States," 85 Fed. Reg. 22,250 (Apr. 21, 2020)............................................ *passim*

Notice of Public Meetings Regarding "Waters of the United States," 86 Fed. Reg.
    41,911 (Aug. 4, 2021)........................................................................................16

**Other Authorities**

*Resource and Programmatic Assessment for the Navigable Waters Protection
    Rule* (Jan. 23, 2020) .........................................................................................18

## INTRODUCTION

Plaintiffs challenge a final agency action by the Environmental Protection Agency and U.S. Army Corps of Engineers (together, the "agencies") promulgating a definition of Waters of the United States ("WOTUS") within the meaning of the Clean Water Act ("CWA"). *See* The Navigable Waters Protection Rule: Definition of "Waters of the United States," 85 Fed. Reg. 22,250 (Apr. 21, 2020) ("2020 Rule"). Because the agencies plan to revise or replace the 2020 Rule, they have requested that this Court remand the 2020 Rule without vacatur so that they may engage in a new rulemaking. U.S. Motion to Remand ("Mot."), Dkt. 34. This Court should grant that request.

Courts may exercise their broad, equitable discretion to grant an agency's request for voluntary remand without vacatur in order to reconsider a previous position in appropriate cases. *See SKF USA Inc. v. United States*, 254 F.3d 1022, 1029 (Fed. Cir. 2001). To determine whether to grant remand without vacatur, courts consider (1) the seriousness of an order's purported deficiencies, and (2) "'the disruptive consequences of an interim change that may itself be changed.'" *Shands Jacksonville Med. Ctr. v. Burwell*, 139 F. Supp. 3d 240, 267 (D.D.C. 2015) (*quoting Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 151 (D.C. Cir. 1993)). Both factors weigh heavily in favor of remand without vacatur here.

First, the 2020 Rule is a lawful interpretation of the CWA that comports with the statutory language and Supreme Court precedent. Tellingly, another court denied a motion to preliminarily enjoin the 2020 Rule because it found the plaintiffs unlikely to succeed on the merits of claims similar to those raised here. *See California v. Wheeler*, 467 F. Supp. 3d 864 (N.D. Cal. 2020). Although the agencies have requested remand to reconsider the 2020 Rule due to their concerns about whether the Rule satisfies their current policy choices, they do not argue that the 2020 Rule

1

is legally invalid. In any case, as the agencies explain in their remand motion, this Court need not—and should not—expend resources addressing the merits.

Second, vacating the 2020 Rule pending the anticipated new administrative rulemaking would disrupt business operations, and with them the national economy. Vacatur would impose confusing standards on a regulatory regime that is of immense practical importance to a large number of essential industries. This is not just a question of hardship caused by swapping one regime for another. Because of the complex and shifting regulatory history of the definition of WOTUS, vacatur of the 2020 Rule would result in a hopelessly confusing chain of changing standards. Vacatur would presumably result in reinstatement of the so-called 2019 Repeal Rule, which repealed the 2015 Rule and governed immediately before the 2020 Rule took effect. But the 2019 Repeal Rule is also subject to widespread litigation, creating a risk that the next-in-line 2015 Rule—a regulation that was held unlawful and remanded by two federal courts but not vacated— could be reinstated next. *See* Ex. 1, Declaration of Don Parrish ("Parrish Decl.") ¶ 72. But that 2015 Rule was preliminarily enjoined in more than half of the states, and in those states the prior 2008 guidance remained in effect. This regulatory patchwork would occur, moreover, under the specter of additional, unpredictable transitions: the agencies intend to first restore the pre-2015 regime—but with unspecified "updates"—and then "propose a second rule." Mot. at 6. Thus, businesses will be forced to adjust twice more after the agencies issue their two anticipated rulemakings.

On top of that complex landscape, the District of South Carolina has already determined, it is prudent to grant the agencies' request to remand the 2020 Rule without vacatur. *See* Ex. 2, *South Carolina Coastal Conservation League v. Regan*, 2:20-cv-01687 (D.S.C. July 15, 2021), ECF No. 147 ("South Carolina Order"); *see also* Ex. 3, *Conservation Law Found. v. EPA*, No.

1:20-cv-10820 (D. Mass. Sept. 1, 2021), ECF No. 122 (remanding 2020 Rule and dismissing suit). In conflict with the District of South Carolina's decision, the District of Arizona has remanded and vacated the 2020 Rule. *See* Ex. 4, *Pasqua Yaqui Tribe v. EPA*, 4:20-cv-00266 (D. Az. Aug. 30, 2021), ECF No. 99. The court did so without ruling on the merits of the plaintiffs' claims, which (as explained below, at pp. 13-14) was legal error. The Intervenor-Defendants in that case are currently considering relief available from the District of Arizona's Order. Repeated, potentially piecemeal regime shifts before the agencies issue their anticipated rulemakings would wreak havoc on the ability of businesses to plan operations. It is far more equitable to keep the 2020 Rule in place while the agencies finalize their next rulemaking and avoid this regulatory morass.

Apart from the risk of regulatory shifts, vacatur of the 2020 Rule would substantially harm regulated parties and landowners, who would face increased uncertainty over whether their property includes WOTUS. Because vacatur would presumably lead to a broader application of WOTUS, more property will be subject to high permitting and compliance costs, property owners and operators will be subjected to an increased risk of regulatory violations, and landowners' ability to use their land will be reduced. In addition to those costs, vacatur would make it harder for landowners and operators to determine whether their property contains WOTUS. Removing that regulatory certainty would increase the cost of making jurisdictional determinations and make the scope of a law with harsh criminal and civil penalties far less predictable. It would also force the regulated community to return to standards that generated widespread confusion and hamstrung operations—a change that would come with the loss of productivity and jobs.

On the other hand, maintaining the status quo while the agencies reconsider the 2020 Rule would not harm plaintiffs, who in their complaint raised solely speculative harms. Plaintiffs'

unsubstantiated speculation cannot override evidence of immense harm to the regulated community.

## FACTUAL AND LEGAL BACKGROUND

The history of the frequently changing federal regulation of WOTUS and the uncertainty caused by litigation over the breadth of WOTUS jurisdiction provide important background and context to understand the harm to the regulated community if the 2020 Rule were vacated on remand.

### A.   STATUTORY AND REGULATORY BACKGROUND.

The CWA establishes multiple programs that, together, are designed "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Through the CWA, Congress also intended to "recognize, preserve, and protect the primary responsibility and rights of States to prevent, reduce, and eliminate pollution." *Id*. § 1251(b). As one part of the CWA's scheme, Congress created two permit programs—section 404 permits for dredge and fill activities, and section 402 permits for other discharges. Those programs regulate the "discharge of any pollutant," which is defined as "any addition of any pollutant to navigable waters from any point source." *Id*. §§ 1311(a), 1362(12)(A). The Act in turn defines "navigable waters" to mean "the waters of the United States, including the territorial seas." *Id*. § 1362(7). The meaning of WOTUS thus determines the scope of the agencies' jurisdiction under the CWA. The history of the agencies' definitions of WOTUS, however, has been one of regulatory uncertainty, only increased by the agencies' litigation losses. That history is important to understanding the impetus for the 2020 Rule, which seeks to cure these past defects by drawing much brighter definitional lines.

In 1974 and 1977, the U.S. Army Corps of Engineers issued initial regulations defining WOTUS. 39 Fed. Reg. 12,115, 12,119 (Apr. 3, 1974); 42 Fed. Reg. 37,122, 37,144 (July 19, 1977).

4

The agencies' interpretation of their own regulations continued to expand over the next few decades, even as the text remained the same. The Supreme Court confronted those increasingly aggressive administrative interpretations in a series of decisions beginning in 1985.

In *United States v. Riverside Bayview Homes, Inc*., 474 U.S. 121 (1985), the Court held that Congress intended the CWA "to regulate at least some waters that would not be deemed 'navigable'" and that it is "a permissible interpretation of the Act" to conclude that "a wetland that *actually abuts* on a navigable waterway" falls within the "definition of 'waters of the United States.'" *Id*. at 133, 135 (emphasis added). Despite *Riverside Bayview* tying wetland jurisdiction to a close physical connection to navigable waters, the agencies "adopted increasingly broad interpretations" of their regulations, asserting jurisdiction over an ever-growing set of features bearing little or no relation to traditional navigable waters. *Rapanos v. United States*, 547 U.S. 715, 725 (2006) (plurality).

One of those interpretations—the Migratory Bird Rule—was struck down in *Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers*, 531 U.S. 159 (2001) (*SWANCC*). There, the Supreme Court held that, while Riverside Bayview turned on "the significant nexus" between "wetlands and [the] 'navigable waters'" they abut, the Migratory Bird Rule asserted jurisdiction over isolated ponds bearing no connection to navigable waters. *Id*. at 167. That approach, the Court held, impermissibly read the term "navigable" out of the statute, even though navigability was "what Congress had in mind as its authority for enacting the CWA." *Id*. at 172.

Subsequently, in *Rapanos*, the Court rejected an expansive interpretation of WOTUS that included sites containing "sometimes-saturated soil conditions," located twenty miles from "[t]he nearest body of navigable water." 547 U.S. at 720-21. Justice Scalia, writing for a four-Justice

plurality, held that WOTUS include "only relatively permanent, standing or flowing bodies of water" and not "channels through which water flows intermittently or ephemerally, or channels that periodically provide drainage for rainfall." *Id*. at 732, 739. Justice Kennedy, concurring in the judgment, expressed support for a "significant nexus" test but categorically rejected the idea that "drains, ditches, and streams remote from any navigable-in-fact water and carrying only minor water volumes toward it" would satisfy his conception of a "significant nexus." *Id*. at 781.

Supreme Court Justices faced with the agencies' expansive but vague approach to their jurisdiction repeatedly warned that "the reach and systemic consequences" of the CWA are "a cause for concern" and urged the agencies to define their jurisdiction in clear terms. Justice Kennedy, joined by Justices Thomas and Alito, complained that "the [CWA's] reach is 'notoriously unclear' and the consequences to landowners even for inadvertent violations can be crushing." *U.S. Army Corps of Eng'rs v. Hawkes, Co*., 136 S. Ct. 1807, 1816 (2016) (quoting *Sackett v. EPA*, 566 U.S. 120, 132 (2012)) (Kennedy, J., concurring). And this lack of clarity "raise[s] troubling questions regarding the Government's power to cast doubt on the full use and enjoyment of private property throughout the Nation." *Id*. at 1817. *See also Rapanos*, 547 U.S. at 757 (to cure their "essentially limitless" interpretation of their jurisdiction, the agencies should issue a definitional rule that ordinary people can understand and that abides by "the clearly limiting terms Congress employed in the [CWA]") (Roberts, C.J., concurring)).

Following the *Rapanos* decision, the agencies did not take up the Justices' request, relying instead on a vague significant nexus standard implemented through guidance documents, causing significant confusion in the regulated community. *See* Parrish Decl. ¶ 18 (explaining that "[t]he scope of federal jurisdiction under the CWA had not been clear under the prior regime"); *id*. ¶¶ 47-54 (explaining harms under the pre-2015 regime).

B.      THE UNLAWFUL 2015 RULE.

It was against this background that the agencies issued a wholesale reinterpretation of WOTUS in the 2015 Rule. Clean Water Rules: Definition of "Waters of the United States," 80 Fed. Reg. 37,054 (June 29, 2015). Despite Chief Justice Roberts' warning in *Rapanos* that the plain language of the CWA was "inconsistent" with "the view that [the agencies'] authority was essentially limitless" (547 U.S. at 757-58 (Roberts, C.J., concurring)), the agencies took a "limitless" view of their jurisdiction when they promulgated the 2015 Rule.

The agencies' new definition of WOTUS swept in features remote from navigable waters that had never before been subject to federal jurisdiction. Its sweeping reach to desiccated features remote from navigable waters significantly increased confusion among regulated parties and regulators alike. *See, e.g.,* Parrish Decl. ¶¶ 18, 47-54.

For the regulated community, including the Intervenor-Defendants and their members, the 2015 Rule was a disaster, imposing huge risks on their members for ordinary land use activities, while bearing no discernible relation to the statutory text or Supreme Court precedent. It was incredibly difficult for the regulated parties operating under the 2015 regime to determine whether a feature on their property qualified as a "water of the United States." Parrish Decl. ¶ 27. Under that expansive but unclear rule, businesses had to "either seek exorbitantly expensive permits or internalize significant costs to avoid accidentally building or operating in features that had not previously been classified as a WOTUS, but were now potentially jurisdictional." *Id*. ¶ 30. As a result, some businesses decreased productivity or abandoned projects. *Id*. ¶¶ 33, 34, 36.

Dozens of lawsuits were filed in district courts and courts of appeals across the country by States and by the regulated community challenging the 2015 Rule. Parrish Decl. ¶¶ 19, 21, 23. During that litigation, the Sixth Circuit stayed the rule nationwide because it was "far from clear" that it could be squared with even the most generous reading of Supreme Court precedent. *In re*

7

*EPA & Dep't. of Def. Final Rule*, 803 F.3d 804, 807 (6th Cir. 2015). After the Sixth Circuit lost

jurisdiction (*see Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617 (2018)), district courts issued

preliminary injunctions covering more than half of the country. *See North Dakota v. EPA*, 127 F.

Supp. 3d 1047, 1051 n.1, 1055 (D.N.D. 2015); *Georgia v. Pruitt*, 326 F. Supp. 3d 1356, 1364-65

(S.D. Ga. 2018); *American Farm Bureau Fed'n v. EPA*, 3:15-cv-165 (S.D. Tex. Sept. 12, 2018),

ECF No. 87.

Ultimately, district courts in Texas and Georgia held that the 2015 Rule is unlawful. The

Texas court held that the 2015 Rule "is not sustainable on the basis of the administrative record"

and remanded it to the agencies. *Texas v. EPA*, 389 F. Supp. 3d 497, 506 (S.D. Tex. 2019). The

Georgia court addressed the substance of the Rule. *Georgia v. Wheeler*, 418 F. Supp. 3d 1336

(S.D. Ga. 2019). It held that the Rule's assertion of jurisdiction over all "interstate waters"

impermissibly reads the term "navigable" out of the statute; its definition of "tributary" extends

federal jurisdiction beyond that allowed under the CWA; and its categorical assertion of

jurisdiction over all waters "adjacent" to tributaries was an impermissible construction. *Id.* at 1363-

68. And it held that the Rule's "vast expansion of jurisdiction over waters and land traditionally

within the states' regulatory authority" constituted a "substantial encroachment" into state power

that "cannot stand absent a clear statement from Congress" under *SWANCC*. *Id.* at 1370, 1372.

## C.   THE 2019 REPEAL RULE AND 2020 NAVIGABLE WATERS PROTECTION RULE.

In 2017, the agencies announced their intent to repeal and replace the 2015 Rule in a "two-

step process." 82 Fed. Reg. 34,899, 34,899 (July 27, 2017). The first step—what we refer to as the

"Repeal Rule"—would "rescind" the 2015 Rule, restoring the status quo ante by regulation. *Id.*

"In a second step," the agencies "[would] conduct a substantive re-evaluation of the definition of

'waters of the United States'" in conformity with the CWA and judicial precedent. *Id.*

In repealing the 2015 Rule, the agencies observed that numerous "court rulings against the 2015 Rule suggest that the interpretation of the 'significant nexus' standard as applied in the 2015 Rule may not comport with and accurately implement the legal limits on CWA jurisdiction intended by Congress and reflected in decisions of the Supreme Court." 83 Fed. Reg. 32,227, 32,238 (July 12, 2018). The Repeal Rule became effective on December 23, 2019. 84 Fed. Reg. 56,626 (Oct. 22, 2019).

When developing the 2020 Rule to replace the 2015 Rule, the agencies engaged in extensive stakeholder outreach and afforded the public 60 days for comment. *See* 85 Fed. Reg. 22,261 (the agencies "reviewed and considered approximately 620,000 comments received on the proposed rule from a broad spectrum of interested parties"). To achieve the "objective of the Clean Water Act to restore and maintain the integrity of the nation's waters" (*id*. at 22,250), the agencies relied on science to "inform[] the[ir] interpretation of [WOTUS]," while recognizing that "science cannot dictate where to draw the line between Federal and State or Tribal waters, as those are legal distinctions that have been established within the overall framework and construct of the CWA." *Id*. at 22,271. To correct the illegalities inherent in the 2015 Rule, the agencies struck "a reasonable and appropriate balance between Federal and State waters" that was "intended to ensure that the agencies operate with the scope of the Federal government's authority over navigable waters." *Id*. And, to address the significant confusion generated under prior regimes, the agencies sculpted the 2020 Rule with "categorical bright lines" to improve clarity and predictability. *Id*. at 22,273.

Far simpler and easier to apply than its predecessors, the key feature of the 2020 Rule is the agencies' streamlined definition of WOTUS as four categories of waters: (1) traditional navigable waters that evidence the physical capacity for commercial navigation, and the territorial seas (together, "TNW"); (2) tributaries to those waters, defined as perennial or intermittent surface

9

water channels that contribute flow to a TNW in a typical year, directly or through another WOTUS; (3) standing bodies of open water (lakes, ponds, impoundments of TNW) that contribute flow to a TNW in a typical year, directly or through another WOTUS, or that are inundated by flooding from a WOTUS in a typical year; and (4) wetlands that directly abut or touch a jurisdictional water, or are flooded from a jurisdictional water in typical year, or are separated from a jurisdictional water only by either a berm, bank, or other natural feature, or by an artificial structure through which there is a direct hydrological surface connection in a typical year (such as a culvert). 85 Fed. Reg. 22,273. These bright line standards significantly advance clarity for regulated parties, and help avoid the costs associated with the uncertainties under all prior definitions of WOTUS. Parrish Decl. ¶ 57.

The Rule also contains 12 exclusions that are "not 'WOTUS.'" Ephemeral features like washes, rills, and gullies that flow only in direct response to precipitation, are categorically excluded from WOTUS. 85 Fed. Reg. 22,340. Exclusion of these ephemerals is critical to the ability of businesses to identify what features on their land may be jurisdictional and thus avoid exorbitant permitting costs or productivity losses associated with a vague or more sweeping definition of WOTUS. Parrish Decl. ¶ 59. Other notable exclusions include ditches that are not tributaries or constructed in jurisdictional features; diffuse stormwater runoff and sheet flow; irrigated uplands; artificial ponds; and water filled depressions or pits incident to mining or construction.

### D.    THIS LITIGATION.

Plaintiffs filed this action on June 25, 2020, asking this Court to vacate and set aside the 2020 Rule. Dkt. 1. Intervenor-Defendants successfully moved to intervene to defend the 2020 Rule shortly thereafter. *See* Dkt. 8 (Motion to Intervene); Dkt. 26 (Order granting Motion to Intervene).

After plaintiffs served a Motion for Summary Judgment on December 14, 2020 (Dkt. 23), the parties filed a joint motion to hold proceedings in abeyance prior to the deadline to oppose summary judgment (Dkt. 27). In seeking abeyance, the parties explained that an Executive Order issued by the then recently-elected Biden Administration directed the agencies to review many rules promulgated in the prior four years, including the 2020 Rule challenged here, and that "[g]ranting [a six month abeyance] will not prejudice any Party, will conserve the Parties' resources, and will promote the interest of judicial economy." *Id.* at 2. This Court accordingly stayed the matter "until further Order of this Court." Minute Order Granting Joint Mot. to Hold in Abeyance (Jan. 28, 2021). The parties filed a Joint Status Report on July 27, 2021, explaining that the agencies intended to file a motion to remand the 2020 Rule without vacatur and proposing a briefing schedule on that motion. Dkt. 33. This Court entered an order adopting the proposed briefing schedule on July 28. The agencies filed their motion to remand without vacatur in accordance with that schedule on August 6. Dkt. 34.

## ARGUMENT

The Court should grant remand without vacating the 2020 Rule. Courts have inherent equitable power to remand agency actions without vacatur. *See Allied-Signal*, 988 F.2d at 151; *California Cmtys. Against Toxics v. U.S. E.P.A.*, 688 F.3d 989, 992-994 (9th Cir. 2012). The Court should exercise that power here.

### A.   THE AGENCIES ARE ENTITLED TO VOLUNTARY REMAND.

Voluntary remand is proper where the agency raises "'substantial and legitimate' concerns in support of remand." *Carpenters Indus. Council v. Salazar*, 734 F. Supp. 2d 126, 132 (D.D.C. 2010) (*quoting Sierra Club v. Antwerp*, 560 F. Supp. 2d 21, 23 (D.D.C. 2008)); *see also SKF*, 254 F.3d at 1029 (explaining voluntary remand is appropriate when an agency states that it "wish[es] to consider further the governing statute, or the procedures that were followed," or if

it "simply state[s] that it had doubts about the correctness of its decision" and such concerns are "substantial and legitimate"); *Util. Solid Waste Activities Grp. v. EPA*, 901 F.3d 414, 436 (D.C. Cir. 2018). "Generally, courts only refuse voluntarily requested remand when the agency's request is frivolous or made in bad faith." *California Cmtys. Against Toxics*, 688 F.3d at 992.

Voluntary remand is appropriate here. Consistent with an administrative agency's authority to reconsider its policies within the limits prescribed by law, the agencies state they have reviewed the 2020 Rule in light of the change in administration and decided to commence a new rulemaking to replace the Rule. Mot. at 8-9. The agencies do not confess legal error, though they acknowledge that they wish to engage in a new rulemaking to address some of the issues raised in this litigation. *Id*. As the agencies explain, remand will conserve judicial resources by avoiding litigation of a rule that may be replaced. *Id*. at 9-10. Indeed, the case pending before this Court remains in its early stages, as it was held in abeyance from January 2021 (before the federal agency defendants or the Intervenor-Defendants had a chance to respond to Plaintiffs' motion for summary judgment) until shortly before the agencies filed the present motion to remand without vacatur.

Remand also will facilitate the administrative process because it will allow the agencies to devote their resources to rulemaking rather than litigation. *See B.J. Alan Co. v. ICC*, 897 F.2d 561, 562 n.1 (D.C. Cir. 1990) (*quoting Commonwealth of Pennsylvania v. ICC*, 590 F.2d 1187, 1194 (D.C. Cir. 1978)) ("Administrative reconsideration is a more expeditious and efficient means of achieving an adjustment of agency policy than is resort to the federal courts"). Remand further allows the agencies to avoid the appearance of pre-judging issues that will be reconsidered in a new notice and comment rulemaking. *See Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 386–87 (D.C. Cir. 2012) (expressing support for allowing the administrative review process to "run its course"). For these reasons, the request for remand should be granted.

**B.      REMAND WITHOUT VACATUR IS APPROPRIATE.**

To determine whether a rule being remanded to an agency should be vacated or remain in place, courts in this district consider "(1) 'the seriousness of the order's deficiencies'" and "(2) 'the disruptive consequences of an interim change that may itself be changed.'" *Shands Jacksonville Med. Ctr. v. Burwell*, 139 F. Supp. 3d 240, 267 (D.D.C. 2015) (*quoting Allied-Signal*, 988 F.2d at 151). Those factors show that vacatur is not appropriate.

First, the "seriousness of the order's deficiencies" does not support vacatur here. *Shands*, 139 F. Supp. 3d at 267. Courts in this district have made clear that assessing a rule's deficiencies requires addressing the merits of the rule. Compare *Nat'l Parks Conservation Ass'n v. Jewell*, 62 F. Supp. 3d 7, 14 (D.D.C. 2014) (the court was able to undertake a determination on the merits where it "has before it the full administrative record, as well as fully briefed cross-motions for summary judgment") with *Carpenters Indus. Council*, 734 F. Supp. 2d at 135-36 (concluding that the court lacked authority to grant vacatur "without an independent determination that the [agency's] action was not in accordance with the law," otherwise "vacatur 'would allow the Federal defendants to do what they cannot do under the APA, repeal a rule without public notice and comment, without judicial consideration of the merits'").  This court recognizes that vacating a rule without a determination that it is arbitrary and capricious, contrary to law, or otherwise is unlawful on grounds set forth in 5 U.S.C. § 706(a) would be an end run around the power granted to courts by Section 706 to "set aside" agency action only on specified grounds, and would interfere with the APA's careful scheme for rulemaking and judicial review of agency action. *See Nat'l Parks Conservation Ass'n v. Salazar*, 660 F. Supp. 2d 3, 5 (D.D.C. 2009) (explaining that vacatur without judicial consideration of the merits would allow agencies to repeal rules without the notice and comment required under the APA); *see also WildEarth Guardians v. Bernhardt*, 2020 WL 6255291, at *1 (D.D.C. Oct. 23, 2020) (court remanded without vacatur, observing that

the "Federal Defendants argue that 'the Court lacks authority to order vacatur ... without an independent determination that [the challenged leasing decisions were] not in accordance with the law,'" and that "Plaintiffs have pointed to no authority to vacate an administrative decision that the court has not had an opportunity to review" on the merits); *Vanda Pharms., Inc. v. FDA*, 2019 WL 1198703, at *2 (D.D.C. Mar. 14, 2019) (court remanded without vacatur and "question[ed] whether it has authority to vacate an agency action before issue has been joined" and "in the absence of a request for emergency relief such as a temporary restraining order").

Here, in granting voluntary remand, the court will not determine whether the 2020 Rule suffers any legal deficiencies. In fact, full briefing has not been completed on the merits and so the Court lacks a sufficient basis to determine the legal validity of the Rule. Nor have the agencies made a determination that the Rule is legally deficient. To the contrary, in another case involving the same Rule and issue, they have rejected as "inaccurate" plaintiffs' assertion that the agencies agree the Rule is unlawful. Reply Brief in Support of Mot. to Remand at p. 4, n.2, *Pueblo of Laguna v. Regan*, No. 1:21-cv-277 (D.N.M. Aug. 27, 2021), ECF No. 34 (agencies "do not go so far as to confess legal error"). This is simply a circumstance in which the agencies are considering a policy change under a new administration before the parties have fully briefed the merits.

Second, even when a court has authority to remand and vacate, vacatur will not be ordered unless the balance of the equities counsels vacatur. *See Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1286 (11th Cir. 2015); *Shands*, 139 F. Supp. 3d at 270 ("resolution of [remedy] turns on the Court's assessment of the overall equities"). Under the circumstances created by the convoluted history of the agencies' attempts to define WOTUS, and the burden imposed on the regulated community by the shifting, and potentially piecemeal, regulatory landscape, the balance of the equities strongly militates against vacatur. By contrast to

the speculative, unsubstantiated harms asserted by plaintiffs, the regulated community stands to be seriously damaged. Vacating the 2020 Rule—which another court has held would likely survive similar challenges (*California v. Wheeler*, 467 F. Supp. 3d 864 (N.D. Cal. 2020))—would create immediate harm and enormous uncertainty across the entire American economy, including for Intervenor-Defendants' members.

### 1.   VACATUR WOULD CAUSE SERIOUS DISRUPTION AND HARM.

In evaluating the disruptive effects of vacatur, courts consider consequences to businesses, including potential suspension of industry activity, lost jobs, and other costs as "essential facts" that are "clearly relevant." *Black Warrior*, 781 F.3d at 1291. Those factors favor remand without vacatur here. Vacatur would cast Intervenor-Defendants' members back into the same sort of uncertainty that has plagued them for years under vague, overbroad, and frequently changing jurisdictional rules, suspending critical business projects and costing livelihoods. *See* Parrish Decl. ¶¶ 25-54.

Clarity regarding which waters are jurisdictional is critical to the vitality of the businesses that operate under these regulations. Landowners or operators who make a mistake face severe criminal and civil penalties. *See id*. ¶ 39. Under a broader definition of WOTUS, businesses would lose the clarity and consistency that the agencies finally provided with the clear jurisdictional standards of the 2020 Rule. *Id*. ¶¶ 57-58. They would again become subject to the significant nexus standard, which is vague and difficult to predict. *Id*. ¶ 65; *see also id*. ¶¶ 47-54 (discussing the inconsistently applied "significant nexus" standard applied through a guidance document adopted in the pre-2015 regime). For example, farmers would again be required to obtain federal permits for minor maintenance tasks, such as replacing obsolete farm infrastructure—a requirement that

may discourage them from engaging in needed maintenance because the permitting process saddles them with costs and attorney fees greater than the value of the maintenance. *Id*. ¶ 71.

Further, absent the 2020 Rule's clear, bright-line rules, "farmers with drainage ditches and ephemeral drains located in and around farm fields would need to again exercise caution and avoid placing seed, fertilizer and pesticides into those potentially regulated features." *Id*. ¶ 66. The farmers would face a choice: either (1) leave their lands fallow for fear of incurring liability under vague regulations or (2) seek unnecessary permits at a cost of tens of thousands of dollars. The greater regulatory burden may become cost-prohibitive for some farmers, leading to the loss of family farms that have been in families for generations. *Id*. ¶ 71. Mining and oil companies will also need to exercise caution over, if not delay or avoid, important new extraction projects if the project's legality is in doubt, particularly around ephemeral features. *Id*. ¶ 67. With greater uncertainty about federal jurisdiction, the cost of home building would also significantly spike. *Id*. ¶ 68. These concerns cut across all aspects of nearly every industry.

And while the agencies intend to replace the 2020 Rule, it is not yet clear precisely how. The agencies state that they intend to return to the pre-2015 regime with unspecified "updates." *See* 86 Fed. Reg. 41,911 (Aug. 4, 2021). Then, they intend to propose an entirely new rulemaking. *Id*. Were the 2020 Rule vacated and then replaced, companies not only would need to adjust back to the former regime, but also would need to prepare for two additional switches in the scope of jurisdiction. Vacatur now, before the agencies finalize either of their two intended rulemakings, would add to the roller-coaster of regulatory changes that Intervenor-Defendants' members have endured, exacerbate uncertainty over whether features are jurisdictional, with the enormous legal and practical consequences that can entail, and thereby further constrain landowners' ability to use their land productively. *Id*. ¶¶ 25-54, 66. By maintaining the status quo under the 2020 Rule while

the agencies make a considered decision about how to proceed, this Court will prevent economically and socially harmful uncertainty in the interim.

Vacatur also would be disruptive to the agencies. Other courts addressing challenges to the former, 2015 WOTUS Rule determined that remand to the agencies, rather than vacatur, was appropriate out of concern for disruption and interference with the administrative process. For example, the Southern District of Georgia held the 2015 WOTUS Rule substantively and procedurally unlawful but determined that, because "administrative efforts are already underway to repeal and replace the WOTUS Rule with a new [lawful] rule," "an order vacating the Rule may cause disruptive consequences to the ongoing administrative process." *Georgia v. Wheeler*, 418 F. Supp. 3d 1336, 1382 (S.D. Ga. 2019); *see also Texas v. U.S. E.P.A.*, 389 F. Supp. 3d 497, 506 (S.D. Tex. 2019) (remanding without vacatur given risk of disruption and in order to "facilitate the Agencies' active attempts to improve on their work of protecting the environment and bringing predictability and clarity to the definition of the phrase WOTUS").

## 2.     REMAND WITHOUT VACATUR WILL NOT PREJUDICE PLAINTIFFS.

Balanced against these significant harms, plaintiffs have pleaded only speculation that they will be harmed by the 2020 Rule. The crux of plaintiffs' allegations of environmental harm is their conjecture that increased pollutant discharges will result from the bright-line rules of federal jurisdiction under the 2020 Rule. *See, e.g.,* Dkt. 1 ¶ 28 (alleging "pollutant increases in each state [are] likely to result"), ¶ 32 (alleging members "are concerned" about being exposed to increases in pollutant discharges). But plaintiffs fail to allege any facts supporting their conclusory fear that the 2020 Rule will result in environmental harm—rendering it wholly unlikely that they will be able to provide evidence that such harm will take place during the period while the 2020 Rule is on remand. Their failure to do so is particularly significant given the fact that the 2020 Rule has

17

been in effect for over a year. It is further undermined by the fact that plaintiffs agreed to a six-month abeyance stating such an abeyance "will not prejudice any Party." Dkt. 27 at 2.

The environmental plaintiffs before the District of South Carolina relied on similar speculation that rampant water pollution will occur, but the district court rejected their argument that such speculation justifies vacatur of the 2020 Rule. For instance, those plaintiffs argued that the 2020 Rule poses harm to waters because the agencies have made a greater percentage of "no federal jurisdiction" findings among the jurisdictional determinations (JDs) that they have issued under the 2020 Rule than under former rules.[1] Such assertions of harm suffer from the same flaw as those that plaintiffs raise before this Court—they are neither supported, nor probable. They conflate clearer standards for federal jurisdiction with a lack of water quality controls and instantaneous environmental impairment. They also overlook that federal protections do remain in place to prevent the destruction that plaintiffs fear. As the agencies explain, "[i]f a pollutant is conveyed through an ephemeral stream to a jurisdictional water, an NPDES permit may likely still be required." *Resource and Programmatic Assessment for the Navigable Waters Protection Rule*, at 92 (Jan. 23, 2020). At bottom, plaintiff's simply rely on conjecture about future harms. The disruption to the regulated community and the administrative process if the Rule were vacated far outweighs plaintiffs' speculation that they or their members might be harmed.

## CONCLUSION

This Court should grant the agencies' motion to remand the 2020 Rule without vacatur.

---

[1] There are a number of reasons why the agencies may have made a greater percentage of "no jurisdiction" findings under the 2020 Rule, including the possibility that, after years of regulatory uncertainty, more private landowners may have submitted relatively easy cases seeking "no jurisdiction" findings to afford themselves clarity. It is also possible that the agencies ruled on the clearest cases of no jurisdiction under the 2020 Rule first; there is, of course, no data regarding the outcomes of pending JDs that the agencies have not ruled on.

Dated this 3rd day of September, 2021          /s/ Colleen M. Campbell
                                                Timothy S. Bishop* (D.C. Bar 449645)
                                                Colleen M. Campbell (D.C. Bar 219082)
                                                Mayer Brown LLP
                                                1999 K Street NW 20006
                                                Washington, DC
                                                Telephone: (202) 263 3000
                                                Facsimile: (202) 263 3300
                                                Email: tbishop@mayerbrown.com
                                                          ccampbell@mayerbrown.com

                                                Brett E. Legner* (IL Bar Number 6256268)
                                                Mayer Brown LLP
                                                71 S. Wacker Drive
                                                Chicago, IL 60606
                                                Telephone:  (312) 701 7829
                                                Facsimile:  (312) 706 8607
                                                Email: blegner@mayerbrown.com

                                                *Attorneys for Business-Intervenors Defendants*
                                                *\* pro hac vice*